UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VARQUIN ENTERPRISES INC., a New York corporation, | : |
| | : |
| | : SDNY Docket No. 07-cv-3953 (LBS) |
| | : |
| Plaintiff, | : NY Supreme Docket No. 07/106,689 |
| | : |
| v. | : |
| | : **NOTICE OF REMOVAL** |
| PERRY PUBLICATIONS LIMITED, a United Kingdom corporation, | : |
| | : |
| | : |
| Defendant. | : **ECF Case** |
| | : |

TO THE CLERK OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1441 and 1446,

Defendant Perry Publications Limited ("Perry") hereby removes the above-captioned action to

the United States District Court for the Southern District of New York.  The grounds for removal

of this action are as follows:

1.      On May 17, 2007, Varquin Enterprises Inc. ("Varquin") commenced an

action against Perry by filing a Summons With Notice and an Order to Show Cause ("OTSC") in

the Supreme Court of the State of New York, County of New York, captioned Varquin

Enterprises Inc. v. Perry Publications Limited, Index No. 07/106689.  Copies of the Summons

With Notice and the OTSC and their attachments are attached hereto as Exhibits A and B

respectively.  Defendant Perry first received a copy of the said documents when they were served

by hand upon their undersigned counsel for Perry late on Friday, May 18, 2007.

2.      The underlying dispute arises from the termination of a copyright and

trademark licensing agreement between defendant magazine publisher Perry and plaintiff

A059820.DOC/1}

magazine publisher Varquin based on the latter's violations thereof, including failure to make payments required under the agreement. Varquin disputes the validity of the termination. The OTSC forces Perry to treat the license as still in effect, and purports to impose a prior restraint against any statement by Perry concerning the termination to third parties.

      3.     This action is a civil action of which this court has original jurisdiction under 28 U.S.C. § 1332 and may be removed to this Court by defendant pursuant to 28 U.S.C. § 1441(b) because it is a civil action in which the plaintiff is a New York resident and the defendant is a resident of the United Kingdom, and the amount in controversy exceeds $75,000. The amount in controversy exceeds $75,000 because, inter alia:

      a.    The action seeks revival of a contract under which a minimum license fee of $200,000 is unpaid, Agreement ¶ 6.1, and under which additional hundreds of thousands of dollars in cash and in-kind payment may change hands, e.g., Agreement (OTSC, Rodriguez Affidavit, Ex. A) ¶¶ 4.4, 4.5, 4.6, 4.8, 4.10, 4.12, 4.13, 4.14;

      b.    The action seeks an injunction against a license termination that could cause the loss of salary of 11 full-time employees, which upon information and belief collectively total over $75,000 (Rodriguez Affidavit, ¶ 40); and

      c.    The action seeks injunctive and declaratory relief which, if granted, would force defendant to license copyrighted materials, license fees for which for the remaining 8 months of 2007 total $104,000 (Agreement, ¶ 4.4).

4.      Alternatively, this Court has original jurisdiction pursuant to 15 U.S.C. §
1121 because this action seeks injunctive and declaratory relief that will determine rights in and
to defendant's federal trademarks BUSINESS TRAVELER (USPTO Reg. No. 1372466) and
BUSINESS TRAVELER INTERNATIONAL (USPTO Reg. No. 1784071).

5.      Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. §
1338(a) because it seeks injunctive and declaratory relief that would force defendant to continue
licensing copyrighted materials to plaintiff.  In fact, defendant has terminated plaintiff's license
to such materials and now holds the copyright thereto unencumbered by any such license.

6.      To the extent that this Notice of Removal is based on general federal
question jurisdiction, it is timely under 28 U.S.C. § 1446(b) because counsel for the defendant
Perry first received service of the OTSC and the Summons with Notice on May 18, 2007.  This
Notice of Removal is being timely filed within 30 days of the receipt of the OTSC and Summons
With Notice.

7.      In accordance with 28 U.S.C. § 1446(d), a true and correct copy of this
Notice of Removal is being filed promptly with the Clerk of Court for the Supreme Court of the
State of New York, County of New York, and notice of same is being given to counsel for
plaintiff.

8.      Defendant Perry reserves the right to amend or supplement this Notice of
Removal.

WHEREFORE, the defendant Perry states that this Court has original jurisdiction
of the action pursuant to 28 U.S.C. § 1331, and that this action is properly removable from the
Supreme Court of the State of New York, County of New York, to this Court.

Dated: May 21, 2007
     New York, New York

               COWAN DeBAETS ABRAHAMS
               & SHEPPARD, LLP

               By _____
                  Toby M.J. Butterfield (TB-8599)
                  Nancy E. Wolff (NW-7508)
                  Mason A. Weisz (MW-5954)

                  41 Madison Avenue, 34th Floor
                  New York, New York 10010
                  Telephone: (212) 974-7474
                  Facsimile: (212) 974-8474

                  *Attorneys for defendant Perry Publications
                  Limited*

# EXHIBIT A

106 - Summons with notice, blank court
Personal or Substituted Service, 12pt 4-94

Excelsior, Publisher, NYC 10013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. 07/106689
Date purchased 5-17-07

VARQUIN ENTERPRISES, INC.

Plaintiff(s) designate(s)
New York
County as the place of trial.

                                        *Plaintiff(s)*

                    *against*

PERRY PUBLICATIONS LIMITED,

**Summons
with Notice**

The basis of the venue is
Plaintiff's Residence

                                        *Defendant(s)*

Plaintiff(s) reside(s) at 303 Fifth Avenue, No. 1306, New York, New York 10016
County of New York

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice appearance, on the Plaintiff's Attorney(s) within 30 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, May 11, 2007

SMITH DORNAN & DEHN PC    *David Hill*
Attorney(s) for Plaintiff

Defendant's address:

2nd Floor, Cardinal House
39-40 Albemarie Street
London, W1s 4TE
United Kingdom

Office and Post Office Address

110 East 42nd Street, Suite 1303
New York, New York 10017

**Notice:** The nature of this action is
Breach of Contract; Breach of Fiduciary Duty; Declaratory Judgment

The relief sought is
Preliminary and Permanent Injunction; Declaratory Relief; Damages in an amount to be determined at trial and such other and further relief as may be set forth in the complaint.

Upon your failure to appear, judgment will be taken against you by default for the sum of $
with interest from                                    and the costs of this action.

**Check "YES" or "NO" for each of the following questions:**

Is this action/proceeding against a

YES  NO
[ ]  [✓]  Municipality?
         (Specify _____)

YES  NO
[ ]  [✓]  Public Authority:
         (Specify _____)

YES  NO
[✓]  [ ]  Does this action/proceeding seek equitable relief?
[ ]  [✓]  Does this action/proceeding seek recovery for personal injury?
[ ]  [✓]  Does this action/proceeding seek recovery for property damage?

**Pre-Note Time Frames:**
(This applies to all cases except contested matrimonial and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue)

☐ Expedited: 0-8 months          ✓ Standard: 9-12 months          ☐ Complex: 13-15 months

**Contested Matrimonial Cases Only:** (Check and give date)

Has summons been served?              ☐ No      ☐ Yes, Date _____

Was a Notice of No Necessity filed?   ☐ No      ☐ Yes, Date _____

**ATTORNEY(S) FOR PLAINTIFF(S):**

| Self Rep. * | Name | Address | Phone # |
|---|---|---|---|
| ☐ | Francis F. Dehn, Smith Dornan Dehn PC | 110 E. 42nd St. 1303 NY, NY 10017 | 212 320 5316 |
| ☐ | | | |

**ATTORNEY(S) FOR DEFENDANT(S):**

| Self Rep. * | Name | Address | Phone # |
|---|---|---|---|
| ☐ | Nancy Wolff Cowen DeBaets, Abrahams & Sheppard | 41 Madison Ave, 34 Fl. NY, NY 10010 | |
| ☐ | | | |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep" box and enter their name, address, and phone # in the space provided above for attorneys.

**INSURANCE CARRIERS:**

**RELATED CASES:** (IF NONE, write "NONE" below)

| Title | Index # | Court | Nature of Relationship |
|---|---|---|---|
| | | | |

I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: _____

_____
(SIGNATURE)

David Atlas
(PRINT OR TYPE NAME)

Plaintiff
ATTORNEY FOR

**ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION**

# EXHIBIT B

At an IAS Part ___ of the Supreme
Court of the State of New York,
County of New York, held at the
Courthouse, 60 Centre Street, New
York, New York, on the ___th day
of May, 2007

PRESENT:

------------------------------------------------------------ X
                                                              :
VARQUIN ENTERPRISES INC.,                                     :
                                                              : Index No. 07|106689
            Plaintiff,                                        :
                                                              : ORDER TO SHOW
    – against –                                               : CAUSE FOR A
                                                              : PRELIMINARY
PERRY PUBLICATIONS LIMITED,                                   : INJUNCTION AND
                                                                FOR A TEMPORARY
            Defendant.                                          RESTRAINING ORDER
                                                              :
------------------------------------------------------------ X

            _____
                 Justice.

        Upon the reading and filing of the annexed Affidavit of Adam Rodriguez, sworn

to on May 🗙, 2007, and the exhibits annexed thereto, the annexed ~~Affidavit of Francis~~ Affirmation of David

~~X. Dehn~~ Atlas, sworn to May 17, 2007, and the exhibits annexed thereto, and all the pleadings

and proceedings had herein, and upon good cause shown, it is hereby

        ORDERED, that defendant Perry Publications Limited show cause before this

Court, before IAS Part ___ of this Court, at the Courthouse located at 60 Centre Street,

New York, New York, Room ___, on the ___ day of _____, 2007 at 10:00

o'clock in the forenoon, or as soon thereafter as counsel can be heard, why an order

should not be issued, pursuant to Rule 6311 of the New York Civil Practice Law and

Rules ("CPLR"), granting plaintiff a preliminary injunction enjoining and restraining

defendant from (i) terminating the parties' April 6, 2006 license/purchase agreement (the "Agreement") pursuant to which plaintiff is publishing *Business Traveler* magazine and otherwise exploiting the BUSINESS TRAVELER mark; (ii) acting in furtherance of its purported letter of termination to plaintiff dated May 3, 2007: or (iii) communicating to any third party that the Agreement has been terminated; and (iv) otherwise interfering in plaintiff's publication of Business Traveler or plaintiff's use of the BUSINESS TRAVELER mark, on the grounds that defendant is acting in violation of plaintiff's rights with regard to the BUSINESS TRAVELER mark and such acts, if allowed to proceed during the pendency of this action, would render any eventual judgment in plaintiff's favor ineffectual; and it is further

ORDERED that, pursuant to CPLR 6313, pending the hearing and determination of this motion, defendant, its officers, directors, agents, servants, investigators, employees, successors, assigns, representatives and attorneys, and any and all persons acting in concert or participation with them, are temporarily and immediately restrained and enjoined from (i) terminating the parties' April 6, 2006 Agreement pursuant to which plaintiff is publishing *Business Traveler* magazine and otherwise exploiting the BUSINESS TRAVELER mark; (ii) acting in furtherance of its purported letter of termination to plaintiff dated May 3, 2007: or (iii) communicating to any third party that the Agreement has been terminated; and (iv) otherwise interfering in plaintiff's publication of Business Traveler or plaintiff's use of the BUSINESS TRAVELER mark, on the grounds that immediate and irreparable injury, loss and damages will result unless defendant is restrained before a hearing can be held; and it is further

ORDERED that defendant's letter of termination to plaintiff dated May 3, 2007 is hereby held in abeyance and shall presently have no force or effect; and it is further

ORDERED that, good cause having been shown that the public disclosure of matters pertaining to this case is likely to cause further irreparable harm to plaintiff, all pleadings, correspondence, exhibits and other papers filed with the Court in this action shall be filed under seal, and the Clerk is hereby directed to restrict disclosure of materials in the Court file in this action to the parties and their counsel until the hearing and determination of plaintiff's application or until otherwise ordered by the Court; and it is further

ORDERED that service of a copy of this Order to Show Cause, together with the papers on which it is based, shall be deemed sufficient if made by personal delivery to defendant's counsel, Nancy Wolff, Esq., Cowan, DeBaets, Abrahams & Sheppard LLP 41 Madison Avenue, 34th Floor, New York, New York 10010, and it is further

ORDERED that defendant's answering papers, if any, shall be served, by hand, upon the offices of plaintiff's attorneys, Francis X. Dehn, Esq., Smith Dornan & Dehn PC, 110 East 42nd Street, Suite 1303, New York, New York 10017, on or before the ___ day of May, 2007 at 5:00 p.m.

ENTER:

_____
J.S.C.

3

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- X
                                          :

VARQUIN ENTERPRISES, INC.
                                          :

          Plaintiff,                    :     Index No.

   -  against -                    :     **AFFIRMATION OF**
                                                  **DAVID ATLAS**

PERRY PUBLICATIONS LIMITED,
                                          :

          Defendant.                :

-------------------------------------------------------------- X

STATE OF NEW YORK     )
                             : ss.:
COUNTY OF NEW YORK  )

       DAVID ATLAS, an attorney in good standing and admitted to practice in the courts of the State of New York, hereby affirms under penalty of perjury pursuant to CPLR 2106:

      1.     I am an attorney with the law firm Smith Dornan & Dehn PC, counsel for Varquin Enterprises, Inc. ("Varquin"), the plaintiff in the above-titled action, and have personal knowledge of the matters set forth herein to the extent set forth below.

      2.     Varquin is seeking an order from the Court enjoining and prohibiting defendant from (i) terminating the parties' April 6, 2006 license/purchase agreement (the "Agreement") pursuant to which plaintiff is publishing *Business Traveler* magazine and otherwise exploiting the BUSINESS TRAVELER mark; (ii) acting in furtherance of its purported letter of termination to plaintiff dated May 3, 2007; (iii) communicating to any third party that the Agreement has been terminated; and (iv) otherwise interfering in plaintiff's publication of Business Traveler or plaintiff's use of the BUSINESS

TRAVELER mark. Plaintiff is also seeking an order from the Court requiring all papers in this action to be filed under seal and directing the Clerk to restrict disclosure of materials in the file to counsel for the parties. Just as defendant's disclosure of the purported termination of the Agreement will inflict irreparable harm on plaintiff, so too would the disclosure of such information within the pleadings in this action.

3.    In addition to the allegations set forth herein, Plaintiff relies on its accompanying Memorandum of Law and the Affidavit of Adam Rodriguez, sworn to May 11, 2007.

4.    No prior application for the relief set forth herein has been made to this or any other Court.

5.    It is necessary to move by Order to Show Cause and to seek a TRO because plaintiff will be irreparably harmed, and indeed its business destroyed, if defendant is able to terminate plaintiff's rights in the BUSINESS TRAVELER mark, communicate to third parties that such rights have been terminated, or otherwise interfere in plaintiff's business or use and exploitation of the mark, pending a full resolution by the Court of the issues in this case.

6.    By contrast, defendant will suffer no great harm, and certainly no irreparable harm, if plaintiff is permitted to carry on with business as usual pending full resolution of this matter. Indeed, as set forth in the accompanying Affidavit of Adam Rodriguez, plaintiff's President, plaintiff has, if anything, added considerable value to the BUSINESS TRAVELER trademark since obtaining the rights to it in April 2006.

7.    This firm has been advised by defendant that its legal counsel in connection with this matter is Nancy Wolff, Esq., a member of the firm Cowan, DeBaets,

2

Abrahams & Sheppard LLP, 41 Madison Avenue, 34th Floor, New York, New York 10010. On May 1 2007, I advised Ms. Wolff by telephone that we would be presenting these papers to the *ex parte* motion support office court today and that, if approved, we would contact her to advise her when we would be appearing before the Judge assigned to hear this case.

Dated: New York, New York
       May 1, 2007

DAVID ATLAS

3

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

VARQUIN ENTERPRISES INC.,                          :
                                                   :
                              Plaintiff,           :
                                                   :     Index No.
              -against-                            :
                                                   :
PERRY PUBLICATIONS LIMITED,                        :
                                                   :
                              Defendant.           :
------------------------------------------------------------------x


**AFFIDAVIT OF ADAM RODRIGUEZ IN SUPPORT OF PLAINTIFF"S
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND A
PRELIMINARY AND PERMANENT INJUNCTION**

STATE OF NEW YORK      )
                       )     ss.:
COUNTY OF NEW YORK     )

        ADAM RODRIGUEZ, being duly sworn, deposes and says:

        1.      I am the President of plaintiff Varquin Enterprises, Inc.

("Varquin"), the publisher of *Business Traveler* magazine. Varquin publishes *Business*

*Traveler* under license from defendant Perry Publications Ltd. ("Perry"), the publisher of,

among other regional editions, the U.K. and Asia/Pacific editions of the magazine (which

is known in those regions as *Business Traveller)*, and the holder of the U.S. registration in

the trademark BUSINESS TRAVELER. Varquin's license/purchase agreement with

defendant, dated April 6, 2006 and attached hereto as Exhibit A (the "Agreement")

entitles Varquin to publish *Business Traveler* under license for a short period, and then to

purchase the trademark and the associated web domain, www.businesstravelerusa.com,

for the sum of ten dollars ($10.00), as soon as July 2008 and in any event no later than

December 2008.

2.     I make this Affidavit in support of Varquin's application for a temporary restraining order and preliminary and permanent injunctive relief. In particular, Varquin seeks, *inter alia*, an injunction prohibiting any and all efforts by defendant to enforce its purported termination of the Agreement as of May 3, 2007, to otherwise impede or interfere with Varquin's rights under the Agreement, or to inform third parties of the purported termination of the Agreement, pending a final resolution by the Court of the issues herein. Varquin has made no prior application in any court for this (or similar) relief.

3.     I am aware that such relief is to be awarded only in extremely exigent situations. This is such a case. In the past 13 months, Varquin has invested more than $500,000 – essentially amounting to my life savings and that of Varquin's other principal, Jake Porter (who has also sold his house and car to fund this venture) – in order to revive the Business Traveler brand in the United States, after the previous licensee had ceased publication of the magazine. From the beginning, Mr. Porter and I have worked at least 80 hours per week, and did so without salary for all of 2006. (In early 2007, we reluctantly put ourselves on the payroll, but only because our accountant insisted upon it and it was required in order for us to receive medical insurance. In so doing, we have expanded *Business Traveler*'s subscriber rolls from just 4,000 when it was handed over to us to more than 150,000 currently. In addition, we have grown the number of advertising pages from 12 in January 2006 (the last issue printed before Varquin assumed control) to 33 in the January 2007 issue. We accomplished this without any monetary investment from defendant, which upon execution of the Agreement supplied us with a single computer, a handful of back issues of the magazine, and no software templates or

2

equipment that one would normally require to put out a magazine. Now, suddenly, defendant would strip away our livelihood, and render our investment valueless, on an obvious and willful pretext.

4.    It cannot be emphasized enough that the primary reason we took on this enormous risk was in order to ultimately be able to purchase the BUSINESS TRAVELER mark in 2008. Conversely, there is no way that we ever would have made such a massive investment in time and financial resources absent the prospect of making the franchise our own.

5.    While defendant purports to have terminated the Agreement because Varquin was late with a contractually required payment, the fact is that defendant is the cause of our temporary financial difficulty. Instead of carrying out its obligation to act as our sales representative outside North America (which it in fact did do in 2006), it has in 2007 re-focused its attention on three new publications in its portfolio, and willfully starved Varquin of needed cash so that defendant can reclaim the North American license, which now, due to Varquin's efforts, is worth many times more than it was in April 2006, when the magazine was moribund and had ceased publishing altogether.

6.    Despite the financial difficulties caused to Varquin by defendant, Varquin has now come up with the money to cover the missed payment and has offered it to defendant, but defendant has rejected the offer. Tellingly, defendant has all but acknowledged that the money was never the real issue anyway but purely a pretext to enable defendant to terminate the Agreement. In a separate letter to me dated May 3, 2007, Julian Gregory, defendant's Managing Director, stated:

3

> This decision…has happened because actions taken by the US magazine have increasingly had a negative impact financially and on the reputation of the Business Traveller brand, in many cases leaving us embarrassed. I would love to find a way for us to continue to work together after all Your hard work but it cannot be under the framework of the current agreement.

7.    We consequently strongly suspect that the real reason behind the termination is to effectuate the final step in defendant's plan to keep from losing the newly-valuable U.S. brand, which defendant now has a strong motive for not wanting to surrender to us in 2008. Its failure to use reasonable efforts to sell ads on our behalf in 2007 is a key component of this strategy.

8.    In any event, the purported termination is null and void pursuant to Paragraph 10 of the Agreement, which provides in pertinent part:

> TERMINATION
>
> This Agreement shall terminate: […]
>
> 10.5    if either of the parties fails to comply with any material term or condition of this Agreement and such failure, if capable of remedy, is not remedied within 28 days of receipt of a written notice of such failure from the other party…

9.    As a result, defendant cannot be deemed to have given written notice of failure to comply with the Agreement's material terms earlier than May 3, 2007, and Varquin is entitled under the Agreement to cure the alleged breach at any time through and including May 31, 2007.

10.    Accordingly, we ask this Court to award injunctive relief, barring defendant from terminating the license at issue or otherwise interfering in any way with Varquin's use of the BUSINESS TRAVELER mark, pending final resolution of the

4

issues in this case.

**Background**

11.    *Business Traveler* magazine has been published in the United States for approximately 19 years.  Defendant Perry, which formerly published the U.S. edition, was a subsidiary of the large publishing concern Euromoney Ltd.  I worked for defendant from 2001 to 2003, ultimately attaining the position of Associate Publisher of *Business Traveler* before leaving the company and starting my own magazine, *Travel Savvy*.

12.    Perry became independent of Euromoney in 2005, when members of its management team, including defendant's current Managing Director, Mr. Gregory, effected a buyout of Perry.

13.    Immediately following the buyout, defendant entered into a license agreement with a company called Frank Publishing, Inc. ("Frank"), pursuant to which Frank agreed to publish the U.S. edition of *Business Traveler*.  I was very instrumental in this agreement, as I had some months earlier sold *Travel Savvy* to Frank, and after learning that Frank was looking for other magazines to become involved in, I urged the management of Frank to seek a license agreement with defendant and suggested to Mr. Gregory that defendant strongly consider Frank as a candidate to publish the U.S. edition once the management buyout of Perry was completed.  Shortly thereafter, I left Frank Publishing.

**Varquin Enters into the Agreement with Defendant**

14.    Not long after Frank entered into the license agreement with defendant, however, Frank's founder, the billionaire Sidney Frank, passed away, and the

successor management of Frank halted publication of the magazine. Shortly thereafter, in or about February 2006, by mutual agreement, Frank surrendered the license to defendant.

15.    At around the same time, Mr. Gregory approached me to inquire whether I would be interested in licensing the right to publish *Business Traveler* in the United States. Although I did not have a large amount of capital to invest in such an effort, I was very much interested.

16.    In the course of our subsequent discussions, Mr. Gregory stressed that it was very important to him that the United States edition of *Business Traveler*, which had ceased publication with the December 2005/January 2006 issue, return to circulation as soon as possible. He emphasized that in his view "Business Traveler/Business Traveller" was an important international brand, and that the absence of a United States edition tended to diminish the value of the brand. He also told me that the longer that a U.S. edition remained unavailable, the more difficult it was going to be to revive the brand in the United States. Moreover, Mr. Gregory stated, if the U.S. brand could not be revived, the other regional editions would likely suffer irreversible damage. Indeed, according to Mr. Gregory, numerous advertisers were already concerned that the U.S. edition might be permanently shuttered, and defendant's other editions were already experiencing reduced advertising as a result of this perception. In fact, we did lose longtime advertisers such as British Airways, Marriott, Priority Club and American Express.

17.    At the same time, Mr. Gregory was quite clear that defendant had neither the staff nor the wherewithal to restart the U.S. edition itself. Indeed, it had

6

almost no tangible assets with which to assist Varquin (or any other potential licensee) in returning the magazine to circulation.

18.    At the same time, Mr. Gregory also told me that my expressed willingness, and commitment, to get the magazine up and running again quickly was a major factor in his preference that Varquin become the U.S. publisher.  In particular, he cited on more than one occasion my history with *Business Traveler* and what he termed my "passion" for the magazine as key elements of his decision to license the rights to Varquin.  At the same time, we discussed the fact that there was really one else out there with the background and the drive to get the magazine out again so quickly, as well as the willingness to invest all of the necessary funds, as Perry was unwilling to make such an investment itself.

19.    Despite all that Varquin had going for it, it was essentially a brand-new company with very limited assets.  Mr. Gregory offered to do various things to help us revive *Business Traveler* quickly, and indeed his offers were absolutely critical to me in deciding to take on the license.  Accordingly, these incentives were set forth in the Agreement.  Among them were such elements as the following:

- Defendant would provide content for each issue through December 2007, which Varquin could either license in the entirety for a specified fee or republish on an "a la carte" basis for 20 cents a word (Paragraphs 4.4 and 4.5);

- Defendant would ensure that advertising sales materials concerning the U.S. edition would be included in the "global media kit" to be used by Perry's worldwide sales staff (Paragraph 4.7);

- Defendant would act as Varquin's sales agent outside North America, in return for a 20% commission on ad sales (Paragraph 4.8); and

- Varquin would have the right to terminate the license arrangement and buy the BUSINESS TRAVELER trademark and the associated web domain as early as July 2008 for the nominal price of ten dollars (Paragraphs 3.2 and 3.3).

20. The Agreement further provided that no license fee (other than fees related to Varquin's use of defendant's editorial content, as described above) would be due to defendant until January 1, 2007, whereupon a monthly fee of $10,000 would take effect, payable on the first day of each month (Paragraph 6.1).

21. Defendant's commitment to act as our sales representative outside North America was particularly critical, in my view, because it meant that a skilled sales force with thorough knowledge of the product we were publishing and with links to the other regional editions of the magazine would be representing Varquin's interests. Not only would we not have to spend precious time identifying and engaging sales agents throughout the world, but we would have experienced people who had already demonstrated their commitment to the product helping to fill our ad pages.

**Varquin's Success in Rebuilding the Business Traveler Brand in the United States**

22. The U.S. edition of *Business Traveler* wasn't just in an unhealthy condition when Varquin entered into the Agreement on April 6, 2006. It was in critical condition, bound for the intensive care unit with a "Code Red" alarm blaring overhead and with its competitors spreading word that the magazine was "out of business."

Frank's stewardship of the magazine, which was fraught with frequent personnel changes, had not been successful, and when Sidney Frank's heirs abruptly announced their intention to exit the publishing business, *Business Traveler* just as suddenly ceased to be.

23.    At that time, Varquin was a new company founded by myself and Mr. Porter following the sale of *Travel Savvy*. We had not at that point decided what direction to take Varquin in, and as such Varquin was not yet doing any business. While I thought both then and now that we had the requisite talent, skill, drive and tolerance for personal and financial risk to take on *Business Traveler*, I think it's also accurate to say that defendant was not receiving any more attractive offers from anyone else. Indeed, even in the sickly state the brand was in in the United States, I have to believe that Mr. Gregory never would have agreed to a contract providing for the outright transfer of the U.S. trademark in 2008 if anyone else had offered him a more favorable deal than us.

24.    As noted above, however, we insisted on the purchase option in large part because the task ahead of us was so daunting. When Varquin assumed control of the magazine in April 2006, it was furnished with a list of just under 4,000 subscribers. Because we were furnished with no templates and only a handful of back issues, we had to reinvent the magazine essentially from scratch.

25.    Nonetheless, we set enthusiastically to work. Mr. Porter and I took no salary, and we hired a talented editor-in-chief, Eva Leonard, at a below-market freelance wage in return for a percentage of Varquin. Gradually we hired and expanded a staff of enthusiastic sales, marketing and editorial staff and freelancers.

26.    In the beginning, we used a significant amount of content from the

9

U.K. edition of *Business Traveller* in our magazine, but quickly began to phase out the licensed content in favor of articles we commissioned directly. Ms. Leonard worked hard to make the magazine's content sharper and more vivid, and more relevant to the U.S. market, and various improvements in the magazine's design were implemented. When the original printer – the one that had been used during the Euromoney and Frank days – made several embarrassing mistakes in the first three issues (such as omitting a number of pages from some copies of the magazine), we terminated the printer's contract and hired a more professional and competent printer.

27.    The changes implemented by Varquin were well received among readers and advertisers. We worked very hard at repairing neglected relationships with advertisers and forging new ones, and we revived the U.S. Business Traveler Awards at a cost of nearly $100,000 to Varquin and made presentations to travel industry award winners at exciting banquets which also raised over $98,000 in funds for the charity Ronald McDonald House of NYC.

28.    Through our hard work, we completely turned the brand around. Within a year we had grown the subscription base to over 150,000, nearly forty times more than it was previously. We had increased advertising sales from $39,000 to approximately $250,000 per issue.

29.    We also benefited substantially from, and relied upon, defendant's sales force, which pursuant to Paragraph 4.8 of the Agreement was acting as our sales representatives and agents outside North America. In 2006, this arrangement worked essentially as I had expected it to. Beginning with the first Varquin-produced issue (May 2006), defendant's sales force brought 17 ads to the magazine, and contributed, after the

deduction of sales commissions, some $138,848 in revenues to Varquin's treasury during 2006.

      30.    In light of the above facts, there can be no serious dispute that the *Business Traveler* franchise is today worth many times what it was worth in April 2006.

**The Effect of Defendant's Failure to Meet Its Obligations to Varquin**

      31.    During the first four months of 2007, however, the flow of cash virtually stopped, as defendant's sales force brought Varquin only a single ad worth $7,964.

      32.    The precipitous decline in ad revenues generated on our behalf by defendant commenced in January 2007, just as Varquin's obligation to pay defendant a monthly license fee of $10,000 took effect, pursuant to Paragraph 6.1 of the Agreement. Moreover, it also coincided with defendant's decision to begin publishing (and selling ads for) three new magazines known as *Buying Business Travel, Mix* and *IMTJ.* It soon became apparent that defendant's sales focus had shifted to publications it owned and operated itself (rather than Varquin's *Business Traveler*, in connection with which defendant could only earn a 20% sales commission).

      33.    This is not merely surmise on my part. Mr. Gregory actually admitted to me that he met with EOS Airlines and convinced them that the money they were spending would be best spent in his new magazine *Buying Business Travel*, rather than in the U.S. edition of *Business Traveler*.

      34.    The result was a double whammy. Varquin became contractually obligated to pay defendant $10,000 a month at the same time that defendant abruptly halted any serious effort to sell ads on our behalf. This shift was particularly

incomprehensible in that the magazine was by any measure more attractive and appealing, and being read by many more people, than in the previous year. *Business Traveler*'s readership is triple that of any of Mr. Gregory's other publications.

35.    Nonetheless, Varquin made the required payments to defendant in January, February and March 2007.

36.    However, Varquin, weakened by the withdrawal of advertising support from defendant in violation of the Agreement, was having difficulty collecting funds sufficient to make April payment at the beginning of the month as usual. Accordingly, I emailed Mr. Gregory, asking his forbearance for a short period until the necessary funds became available. Although he did not reply, I saw no particular reason for concern given my long business friendship with Mr. Gregory and Varquin's enormous success in rebuilding the brand in the United States.

37.    Consequently, on May 9, 2007, I was shocked and stunned to receive a one-sentence letter from Mr. Gregory dated May 3, 2007 and purporting to terminate the Agreement (Exhibit B).

38.    On the same date, I also received a second letter from Mr. Gregory, also dated May 3, 2007 (Exhibit C). In it, he all but conceded that the late payment was only a pretext for defendant's real aims:

> The decision has not been taken lightly and is one I personally feel sad to do. It has happened because actions taken by the US magazine have increasingly had a negative impact financially and on the reputation of the Business Traveller brand, in many cases leaving us embarrassed.
>
> A letter is not the place to go into the details but I will happily discuss these with you on the phone or face to face.
>
> I would love to find a way for us to continue to work together after

all your hard work but it cannot be under the framework of the current agreement

39.     With all due respect to Mr. Gregory, his reported worry for the "reputation of the …brand" is transparent nonsense. Just a year ago, he was happy to enter into an agreement pursuant to which defendant would hand over the United States trademark by 2008, because defendant's only concern was that someone get the U.S. magazine up and running so that the complete absence of the brand in North America did not adversely impact the worldwide brand. Suddenly, now that Varquin has dramatically raised the profile of the brand in the U.S. after just one year, the notion that defendant is somehow worse off is laughable. The obvious fact is that defendant wants to neutralize, by any means available to it, Varquin's purchase option and reclaim undisputed ownership of the United States trademark, because it is now valuable.

**Plaintiff's Need for Emergency Injunctive Relief**

40.     Unless the Court intervenes promptly on our behalf, Varquin's business will be destroyed. Mr. Porter and I, Varquin's principals, have invested virtually all of our money and all of our time into making *Business Traveler* (including its associated website and email newsletter) a success. It would be cold comfort if the magazine is shut down, or if we lose the ability to publish it for the time being, only for the Court ultimately to conclude that our position should be upheld. By that time Varquin would be irreparably – and mortally – injured. Having already weathered four changes of control and not being published for four months before Varquin took it over, the U.S. edition of *Business Traveler* cannot survive another shut down of operations. Indeed, *Business Traveler* would face massive and insurmountable obstacles to reentry, including the loss of advertisers, subscribers as well as the loss of reputation, goodwill

and confidence in the marketplace that we have worked so hard to build. Simply put, if the Court does not issue a TRO and preliminary injunction to prevent defendant from acting in furtherance of its purported termination, Varquin would be eliminated from the travel-journalism industry. Eleven full time Varquin employees, as well as interns and freelancers would lose their jobs. Money damages thus could not adequately compensate Varquin for these injuries.

41.     In addition, defendant should be immediately enjoined from communicating to any third party that the Agreement has been terminated. If advertisers and subscribers are given such information, they will be confused and discouraged from further dealings with Varquin, and the resulting injury is overwhelmingly likely to be irreparable.

42.     For these same reasons, we also are requesting that the Court order all papers in this case to be filed under seal and that the Court Clerk be directed to release papers only to the parties and their attorneys. If it were to become public that Perry has purported to terminate the Agreement, it would immediately and irreparably and significantly damage Varquin's ability to do business.

43.     We are confident that the weight of evidence will show that defendant's breach of its contractual obligation to use reasonable and good-faith efforts to sell advertising space to entities outside North America on Varquin's behalf was a "but for" cause of Varquin's inability to make the April 1, 2007 payment to defendant within the period specified in the contract.

44.     We also believe that the Court will conclude that even if defendant's breach was not the cause of Varquin's inability to make the specified

payment, it is contractually entitled to cure the deficiency during a period lasting 28 days from the notice directed to Varquin by defendant. I don't know precisely when the notice was served, but given the date of the termination letter, it could not possibly have been earlier than May 3, 2007, in which case we should have at least through May 31, 2007 to cure the deficiency.

WHEREFORE, for the reasons set forth above, I respectfully request that the Court grant Varquin's application for a preliminary injunction and for a temporary restraining order (as well as a sealing order) pending a hearing on this matter, along with such further and other relief as the Court may deem appropriate.

ADAM RODRIGUEZ

Sworn to before me this
15 th day of May 2007

Notary Public

BARBARA A. MCCORMICK
Notary Public, State of New York
No. 02MC6128717
Qualified in New York County
My Comm. Expires Jun. 13, 2009

# EXHIBIT A

DATED: April 7, 2006

PERRY PUBLICATIONS LIMITED (1)

VARQUIN ENTERPRISES INC. (2)

---

### LICENCE AGREEMENT
**Business Traveler**
**North American Edition**

---

AN AGREEMENT made on 7 April 2006

BETWEEN

(1)     PERRY PUBLICATIONS LIMITED (registered no. 770834) of 10 John Street, London, WC1N 2EB ("the Licensor"); and

(2)     Varquin Enterprises Inc., 245 East 24th Street, Apartment 2G,  New York, NY 10010,  (the Licensee");

INTRODUCTION

(A)     The Licensor publishes a magazine entitled "Business Traveller" in the English language.

(B)     The Licensor has agreed to authorise the publication by the Licensee of a magazine under the title "Business Traveler" comprising material from the UK Magazine and the use of the Licensed Marks (defined below) in connection with such magazine, subject to the following terms and conditions.

IT IS AGREED as follows:

1.      DEFINITIONS

        In this Agreement:

1.1     *"Artworks"* means such of the photographs, drawings and other illustrative material published in the Magazine as shall be notified by the Licensor to the Licensee as available for publication in the North American Edition from time to time during the period of and in accordance with this Agreement;

1.2     *"the Expiry Date"* means 31st December 2008, or the date of termination under Clause 3.3;

1.3     *"the Intellectual Property"* means the Licensor's rights to the Licensed Marks.

1.4     *"the Licensed Marks"* means the Trade Marks listed in the First Schedule;

1.5     *"the Material"* means the articles and other editorial material selected from and published by the Licensor in the Magazine.

1.6     *"the Magazine"* means all or any of the magazines published by the Licensor under the title "Business Traveller" in the UK and Asia/Pacific markets;

1.7     *"the North American Edition"* means the magazine published by the Licensee under the title "Business Traveler," any supplements published in association with such magazine and the website www.businesstravelerusa.com;

1.8     *"the Term"* means the term of this Agreement specified in Clause 3;

2

1.9 *"the Territory"* means North America, including the U.S. and Canada and their territories and possessions.

1.10 *"working day"* means any day on which banks in the City of London are open for business;

1.11 Headings contained in this Agreement are for reference purposes only and should not be incorporated into this Agreement and shall not be deemed to be any indication of the meaning of the clauses and sub-clauses to which they relate.

2. LICENCE

2.1 The Licensor hereby grants to the Licensee the exclusive licence during the Term:

    2.1.1 to reproduce the Material for publication in the North American Edition; and

    2.1.2 to use the Licensed Marks for the purposes of publishing, distributing, marketing and promoting ("exploiting") the North American Edition under or by reference to the Licensed Marks throughout the Territory on the terms of this Agreement.

2.2 Provided that the Licensee shall not reproduce, make use, authorise or permit the reproduction or use of, any of the Material or the Artworks or transparencies thereof (other than pursuant to the rights granted under this Agreement) without the prior written consent of the Licensor in accordance with this Agreement.

3. TERM

3.1 This Agreement shall be deemed to commence on the date hereof ("the Commencement Date") and shall continue until the Expiry Date, subject to prior termination as provided in Clause 3.3 or Clause 10.

3.2 On the Expiry Date, the Licensor will, at the reasonable expense of the Licensee, transfer to the Licensee ownership of the Intellectual Property and the domain name www.businesstravelerusa.com, subject to the payment of the fees agreed in Clause 6 and the payment by Licensee of the additional consideration of Ten Dollars ($10.00). For the avoidance of doubt, the provisions of this Clause 3.2 shall not apply in the case of any termination under Clause 10.

3.3 The Licensee may terminate this Agreement on giving not less than 30 working days written notice to expire on any date on or after 1 July 2008 subject to the Licensee paying to the Licensor on or before the termination date specified in the notice a sum equal to the balance (if any) of the Licence fee specified in Clause 6.1 remaining unpaid plus the additional consideration of Ten Dollars ($10.00), in which event the transfers specified in Clause 3.2 shall be effective as of the date of termination pursuant to this Clause 3.3.

4    OBLIGATIONS OF LICENSOR

4.1    The Licensor shall provide to the Licensee throughout the term of this Agreement as soon as reasonably practicable, one copy of each issue of the Magazine.

4.2    The Licensor shall, as far as is practicable, provide to the Licensee the editorial schedule for the forthcoming issues of the Magazine. The Licensor will provide to the Licensee, in a timely manner, an electronic copy of those articles requested for publishing in the North American Edition. The Licensor will also provide copies of photographs and illustrations, where the necessary consents have been obtained from the copyright holders, when requested by the Licensee.

4.3    The Licensor shall work with and assist the Licensee in 2006 on the Business Traveler Awards and Silent Auction.

4.4    The Licensor shall provide, if requested by the Licensee, completed editorial, advertising and design content for the May 2006, June 2006, July/August 2006 and September 2006 issues and send files electronically to the Licensee's printer in a form suitable for printing. The Licensee shall, in addition to the fee payable under Clause 6.1, pay to the Licensor a further fee, which at the Licensee's option (the Licensor to be notified in writing at least eight weeks before the date of publication of an issue) shall be either (i) US$13,000 per issue, in respect of the cost of such editorial content, with the exception of any editorial content written by the Licensor at the specific request of the Licensee ("the Special Content"), for which a separate fee shall be agreed, or (ii) a fee to be calculated on an "a la carte" basis with editorial content reproduced by the licensee charged at a rate of US$0.20 per word.

4.5    The Licensor shall provide, if requested by the Licensee, completed editorial, advertising and design content for the October 2006 through December 2007 issues (inclusive) and send files electronically to the Licensee's printer in a form suitable for printing. The Licensee shall, in addition to the fee payable under Clause 6.1, pay to the Licensor a further fee, which at the Licensee's option (the Licensor to be notified in writing at least eight weeks before the date of publication of an issue) shall be either (i)US$21,000 per issue to include the cost of such editorial content, except any Special Content for which a

separate fee shall be agreed, or (ii) a fee to be calculated on an "a la carte" basis, with editorial content reproduced bt the licensee charged at a rate of US$0.20 per word.

4.6    The Licensor shall provide, if requested by the Licensee, completed editorial, advertising and design content for the Four-Hour Guide in September 2006 and September 2007 and send files electronically to the Licensee's printer in a form suitable for printing. The Licensee shall pay the Licensor a fee of US$3,000 per edition to reproduce and publish such editorial content, with the exception of any Special Content for which a separate fee will be agreed.

4.7    The Licensor shall ensure that the North American Edition is included in the global media kit to be used by all the Licensor's sales staff and representatives throughout the world.

4.8    The Licensee shall appoint the Licensor as the Licensee's sales representative outside the Territory, and shall pay a commission of 20% to the Licensor on net advertising, sponsorship and subscription sales made by the Licensor, such commission to include any sales representative's commission with the [usual] representation, sales and commission terms to apply.

4.9    The Licensor shall not sell the Magazines on newsstands in the Territory, nor shall the Licensor license anyone else to do so.

4.10    The Licensor shall assist the Licensee in the distribution of weekly email newsletters until 31 December 2007, for which service Licensee will pay Licensor a fee of US$100 per newsletter.

4.11    The Licensor warrants to the Licensee that the Licensee will have no liability in respect of the publication of Business Traveler (i.e., the North American Edition) prior to and including the February 2006 issue.

4.12    The Licensor shall provide the Licensee with 6 complimentary full pages of advertising each year for the sole purpose of barter advertising in respect of Business Traveller awards.

4.13    The Licensor will make available to the Licensee the full use of the url www.businesstravelerusa.com during the Term.

4.14    The Licensor will provide the Licensee with up to US$25,000 of barter credits with Intagio for the sole purpose of printing stationery to facilitate the establishment by

Licensee of its New York offices; the Licensee shall make all arrangements for printing and liaison with Intagio.

4.15    The Licensor will provide the Licensee with advice and assistance in 2006 in respect of the ABC audit and distribution of the North American Edition.

4.16    The Licensor will supply to the Licensee one computer with Quickfill software containing all existing subscriber details.

OBLIGATIONS OF LICENSEE

The Licensee agrees with the Licensor:

5.1    to ensure that a copyright notice in a form first to be agreed by the parties appears on the contents page of all copies of the North American Edition;

5.2    to send to the Licensor on publication 10 free copies of each issue of the North American Edition;

5.3    to allow the Licensor to reproduce and publish in the Magazine such editorial copy as the Licensee permits and selects from the North American Edition at a cost of $0.20c per word.

5.4    that it shall act as the Licensor's sales representative for the Territory (except those areas already covered by Licensor's sales representatives). A commission of 20% will be payable (including any sales representatives' commission) on net advertising, sponsorship and subscription sales made by the Licensee;

5.5    that it will be responsible for fulfilling all current subscriptions for the North American Edition until they expire;

5.8    that it shall not sell the North American Edition on newsstands outside the Territory;

5.9    that it shall provide the Licensor with 6 complimentary pages of advertising each year.

5.10    subject to the Licensor fulfilling its obligations under Clause 4.17, to fulfil all unfulfilled subscriptions for the North American Edition.

6.    ROYALTY AND FEES

6.1    In consideration of the licence granted herein, the Licensee shall pay to the Licensor the sum of US$240,000, payable in 24 monthly instalments of US$10,000, the first instalment to be paid on 1 January 2007.

6.2    Settlement for all other payments due from the Licensee to the Licensor will be made quarterly, on 30 June, 30 September, 30 December and 31 March in each year, with the first payment to be made on 30 June 2006.

6.3     The Licensee will remit all payments to Perry Publications at Lloyds TSB Bank PLC, sort code: 30-12-18, account name: Perry Publications Limited, account no: 11393219, or such account as the Licensor shall nominate in writing;

6.4     In the event of any payment of any money due to the Licensor under the terms of this Agreement more than 10 days after the due date, the Licensee shall pay to the Licensor interest accruing from day to day calculated at the annual rate of 2% above the base rate from time to time of National Westminster Bank plc on any such money unpaid from the due date for payment until the actual date of payment.


7.     INDEMNITY OF LICENSEE

7.1     The Licensee will keep the Licensor fully indemnified against all losses and all actions, claims, costs, damages and proceedings (including any damages or compensation paid by the Licensor) which may be brought or made against the Licensor arising out of the publication of the North American Edition by or on behalf of the Licensee and attributable to the act or default or failure of the Licensee, provided that in the event of any such claim being made the Licensor will not make any admission of liability, but will forthwith hand over the conduct and control of such claim to the Licensee with full power to use the name of the Licensor to defend any action and take such steps therein, including the settling of any such claim or action, as the Licensee at its reasonable discretion thinks fit. The Licensee shall in dealing with any such claim consult with the Licensor in a manner and to an extent appropriate to that claim, provided that the indemnity in this Clause 7.1 shall not apply in the case of any actionable matter caused by the breach, default or failure of the Licensor or arising from content supplied by the Licensor.


8.     WARRANTY AND INDEMNITY OF LICENSOR

8.1     The Licensor warrants to the Licensee that the Licensor is the sole owner of the rights herein granted, that the reproduction or authorised reproduction of any Material or Artworks pursuant to this Agreement will in no way whatever violate or infringe any existing copyright or third-party right, including but not limited to third parties' rights of privacy, and that the Material and Artworks do not contain anything defamatory or otherwise actionable.

8.2     The Licensor will indemnify and keep the Licensee fully indemnified against all actions, suits, proceedings, claims, demands or damages occasioned to the Licensee in consequence of any breach of the above warranties by the Licensor, provided that in the event of any such claim being made, the Licensee will not make any admission of liability, but will forthwith hand over the conduct and control of such claim to the Licensor with full power to use the name of the Licensee

to defend any action and to take such steps therein, including the settling of any such claim or action, as the Licensor at its reasonable discretion thinks fit. The Licensor shall in dealing with any such claim consult with the Licensee in a manner and to an extent appropriate to that claim. The indemnity in this Clause 8.2 shall not apply in the case of any actionable matter caused by the breach, default or failure of the Licensee.

9. **RIGHTS IN THE LICENSED MARKS AND COPYRIGHT**

9.1 The Licensee hereby agrees and undertakes to use the Intellectual Property only in the Territory on or in relation to the North American Edition, for the purpose of exercising its rights and performing its obligations under this Agreement.

9.2 The Licensee shall not during the Term use the Intellectual Property in any way which might prejudice their distinctiveness or validity.

9.3 Except as provided herein, the Licensee shall not have ownership of the Intellectual Property, and the Licensee hereby acknowledges that it shall not acquire any such ownership rights in respect thereof and that all such rights are and shall remain vested in the Licensor, subject to the provisions of Clause 3.2.

9.4 The Licensee shall at the expense of the Licensor take all such steps as the Licensor may reasonably require to assist the Licensor in maintaining the validity and enforceability of the Intellectual Property during the Term.

9.5 The Licensee shall promptly and fully notify the Licensor of any actual, threatened or suspected infringement in the Territory of the Intellectual Property or the rights in any Artworks which comes to the Licensee's notice, and of any claim by any third party coming to its notice, that the sale of the North American Edition in the Territory infringes any rights of any other person, and the Licensee shall at the request and expense of the Licensor do all such things as may be reasonably required to assist the Licensor in taking or resisting any proceedings in relation to any such infringement or claim.

10. **TERMINATION**

This Agreement shall terminate:

10.1 if the Licensee fails to publish the North American Edition for more than six months without material plans and measures to resume publication;

10.2 on the Expiry Date, or earlier subject to Clauses 3.2 and 3.3 hereof;

10.3 if the Licensee fails to make any payment pursuant to Clause 6 of this Agreement within 28 days of the due date;

8

10.4    upon written notice from the Licensor to that effect, if any material change occurs in the management or control of the Licensee;

10.5    if either of the parties fails to comply with any material term or condition of this Agreement and such failure, if capable of remedy, is not remedied within 28 days of receipt of a written notice of such failure from the other party, or

10.6    if either party goes into liquidation, either compulsory or voluntary (save for the purpose of solvent reconstruction or amalgamation), if a receiver or manager is appointed in respect of the whole or any part of either of party or of its assets, or if either party makes any assignment for the benefit of or composition with its creditors generally or threatens to do any of these things, or under the law of any jurisdiction, anything occurs analogous to any of such events.

## 11.    AFTER TERMINATION

Following the termination of this Agreement under Clause 10.1 or by the Licensor under Clause 10.3 to 10.6 inclusive:

11.1    the Licensee shall not thereafter publish or authorise the publication of any publication under the title the Business Traveler or including such title or any title confusingly similar to such title.

11.2    Clauses 6, 7, 8, 9, and 11 shall each continue in force in accordance with their terms.

## 12.    MISCELLANEOUS

12.1    The Licensee may not assign, charge or otherwise deal with this Agreement or any of the rights granted without the previous written consent of the Licensor. The Licensor may assign, charge or otherwise deal with this Agreement or any of its rights or obligations without the previous written consent of the Licensee, and shall give written notice of any such assignment to the Licensee.

12.2    Each of the parties warrants it has power to enter into this Agreement and has obtained all necessary approvals to do so.

12.3    The receipt of money by either of the parties shall not prevent either of them from questioning the correctness of any statement in respect of any money.

12.4    In the event of national emergency, war or prohibitive governmental regulations, or if any other cause beyond the reasonable control of the parties renders performance of the Agreement impossible for a period of 2 calendar months, all parties will be released from their respective obligations whereupon:

12.4.1    all money due to the Licensor will be paid within 30 days of such event

12.4.2    the Licensee shall forthwith cease to use the names "Business Traveler" and "Business Traveller International", the Material and the Artwork.

The parties acknowledge that this Agreement contains the whole agreement between the parties and it has not relied upon any oral or written representations made to it by the other or its employees or agents. Neither of the parties shall have any right of action against the other party arising out of or in connection with any such representation (except in the case of fraud).

12.6    This Agreement supersedes any prior agreement between the parties, whether written or oral, and any such prior agreements are cancelled as at the Commencement Date but without prejudice to any rights which have already accrued to either of the parties.

12.7    Each of the parties shall give notice to the other of change of any address or telephone or similar number as soon as practicable.

12.8    Any notice, consent or the like, to be served on either of the parties by the other shall be in writing and delivered personally to a director of the party to be served or sent by prepaid courier such as FedEx or a comparable service, to the address of the party to be served set out above, or such other address as shall have been notified in accordance with this clause.

12.9    The parties are not partners, nor is the Licensee able to act as agent for the Licensor save as authorised by this Agreement.

12.10    This agreement shall be governed and interpreted by the laws of the United States and the relevant law of New York State England and all disputes unless otherwise agreed will be subject to the -exclusive jurisdiction of the state and federal courts located within the City of New York, County of New York.

12.11    The failure by either party to enforce at any time or for any period any one or more of the terms or conditions of this Agreement shall not be a waiver of them or of the right at any time thereafter to enforce all terms and conditions of this Agreement.

12.12    Each of the parties shall pay the costs and expenses incurred by it in connection with this Agreement.

12.13    Each of the parties agrees that each shall bear its own liability for any taxation chargeable in the United Kingdom or elsewhere (including VAT or similar tax) arising under this Agreement and each undertakes to indemnify the other in respect of any such taxation assessed on and paid by the other in respect of which the other is primarily liable.

12.14    The provisions hereof shall be binding on the parties' respective permitted assigns.

12.15    This Agreement may be executed in counterparts, each of which shall be an original but such counterparts taken together shall constitute one and the same agreement.

12.16    The Parties agree to keep all terms of this Agreement secret and confidential, and not to make any announcement relating to it without the prior written consent of the other.

AS WITNESS the hands of the duly authorised representative of the parties the day and year first before written.

THE FIRST SCHEDULE

Business Traveler



Trade Mark

Business Traveler – Class 16 – Reg No. 1372466

Business Traveler International– Class 16 – Reg No. 1784071

SIGNED by JULIAN GREGORY      )
for and on behalf of                        )
PERRY PUBLICATIONS          )
LIMITED                                   )


SIGNED by ADAM RODRIGUEZ    )
for and on behalf of                        )
VARQUIN ENTERPRISES INC     )

04/12/06

13

# EXHIBIT B

# Business Traveller

2nd Floor, Cardinal House,
38-40 Albemarle Street,
London, W1S 4TE
www.businesstraveller.com

Tel: +44 (0)20 7647 6330
Tel: +44 (0)20 7647 6360 (Advertising)
Tel: +44 (0)20 7647 6353 (Editorial)
Tel: +44 (0)844 477 0943 (Subscriptions)
Fax: +44 (0)20 7647 6331

Adam Rodriguez
Director, North America
Varquin Enterprises Inc
303 Fifth Avenue
Suite 1306
New York
NY 10016-6601

Thursday 3rd May 2007

Dear Adam

As stated in clause 10.3 of the licence agreement between PERRY PUBLICATIONS LIMITED and VARQUIN ENTERPRISES INC we hereby terminate the agreement.

Yours Sincerely

Julian Gregory
Managing Director

Perry Publications Ltd. Registered Office: 10 John Street, London, WC1N 2EB
Registered in England No.770834 GB VAT No. 868 1406 07

# EXHIBIT C



Adam Rodriguez
Director, North America
Varquin Enterprises Inc
303 Fifth Avenue
Suite 1306
New York
NY 10016-6601

Thursday 3rd May 2007

Dear Adam

You will have now read the official termination of the contract between us. This is something that has been done after considerable discussion at Board level and with Senior management in all our offices.

The decision has not been taken lightly and is one I personally feel sad to do. It has happened because actions taken by the US magazine have increasingly had a negative impact financially and on the reputation of the Business Traveller brand, in many cases leaving us embarrassed.

A letter is not the place to go into the details but I will happily discuss these with you on the phone or face to face.

I would love to find a way for us to continue to work together after all your hard work but it cannot be under the framework of the current agreement.

I am travelling in the Middle East this week but will be back in the office from Monday 7th and would be happy to speak to you.

Regards

Julian Gregory
Managing Director