UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VARQUIN ENTERPRISES INC., a New York corporation, | : Docket No. 07 CV 3953 (LBS) |
| Plaintiff, | : |
| v. | : **DECLARATION**<br>: **OF JULIAN GREGORY** |
| PERRY PUBLICATIONS LIMITED, a United Kingdom corporation, | : |
| Defendant. | : **ECF Case** |

I, JULIAN GREGORY, declare:

1.    I am the Managing Director of defendant Perry Publications Limited ("Perry"). The matters stated below are true of my personal knowledge and if called upon to testify I could and would competently testify thereto, except where otherwise indicated.

2.    I submit this declaration in support of Perry's application by way of Order to Show Cause for a temporary restraining order and preliminary injunction prohibiting Varquin Publishing, Inc. ("Varquin"), the plaintiff in an action removed from State Court, from utilizing Perry's registered trademark "BUSINESS TRAVELER" on and in connection with Varquin's magazine publishing ventures.

3.    Since 1976, Perry has published Business Traveller (the "Magazine") in various media markets around the world. The Magazine is the best-selling business travel magazine, and is written for discerning travelling businessperson who seeks an independent view of worldwide travel issues. The Magazine and businesstraveller.com website provide up-to-the-minute information on all aspects of travel: airlines, airports, hotels, car rentals and more. It also

covers topical issues such as health, security, gadgets and leisure recommendations, as well as tools for airline and hotel reservations. In addition, subscribers to Business Traveller TravelPlan have access to timetables for scheduled flights worldwide, regularly updated city guides, and other useful information.

4. Either directly or via licenses and joint ventures, Perry publishes numerous editions of Business Traveller magazine. Business Traveller was first published in the U.K. in 1976. Today there are nine editions: UK and Europe (the "U.K. Edition"), Germany, the Middle East, Asia-Pacific, China, Hungary, Spain, South Africa and Denmark. Collectively, Business Traveller distributes monthly up to 320,000 copies of the various editions of the Magazine throughout the world. Prior to the termination of the U.S. edition in issue in this case, that maximum was well over 500,000 distributed copies.

5. The Business Traveller is also world-famous for its annual Business Traveller Awards, a star-studded international competition that recognizes outstanding achievement in business travel. At the awards ceremonies, which take place in different countries including the United States, high-profile presenters attend and present awards, garnering considerable media attention. Past presenters have included Princess Diana, Sam Donaldson, actress Sarah Jessica Parker, Princess Anne, astronaut Buzz Aldrin, and Queen Rania of Jordan.

6. By reason of the Magazine's success in various media markets worldwide, consumers in the United States and elsewhere associate Perry with the Marks BUSINESS TRAVELER and BUSINESS TRAVELER INTERNATIONAL (the "Marks").

7. Perry is also the owner of various trademark registrations for the trademarks BUSINESS TRAVELLER and/or BUSINESS TRAVELER (depending on the most

2

accurate spelling of the title of the Magazine in the various jurisdictions where it appears) and permutations thereof. In the United States, Perry owns all right, title and interest in and to the trademark BUSINESS TRAVELER (Reg. No. 1372466 issued on November 26, 1985 by the United States Patent and Trademark Office) and BUSINESS TRAVELER INTERNATIONAL (Reg. No. 1784071 issued on July 27, 1993).

8.      By agreement dated April 7, 2006 (the "License"), a true and correct copy of which is annexed hereto as Exhibit A, Perry granted to Varquin the limited right to publish the North American Edition, which had previously been published by another licensee. Under the License, Varquin had the right to incorporate articles and other materials from the U.K. Edition into the North American Edition alongside content generated by Varquin specifically for the North American Edition, subject to both Perry's consent and Varquin's payment for rights to the U.K. Edition material.

**Payment Provisions of the License.**

9.      The payment terms of the License are simple, and appear in the License as follows:

> "6.1    In consideration of the licence granted herein, the Licensee shall pay to the Licensor the sum of US $240,000, payable in 24 monthly instalments of US $10,000, the first instalment to be paid on 1 January 2007.
>
> 6.2    Settlement for all other payments due from the Licensee to the Licensor will be made quarterly, on 30 June, 30 September, 30 December and 31 March in each year, with the first payment to be made on 30 June 2006."

The "other payments" to which Clause 6.2 refers include the fees for use of material from the U.K. Edition, and are described elsewhere in the License.

3

**Termination Provisions of the License.**

        10.    The termination provisions of the Agreement are equally simple. The

License states that it terminates automatically upon any of five enumerated occurrences (Clauses

10.1, 10.2, 10.3, 10.4 and 10.6). In addition, the Agreement also may terminate if there is any

other material breach and the breaching party fails to cure within 28 days after notice in writing.

(Clause 10.5). The clause states that termination occurs:

> "10.1  if the Licensee fails to publish the North American Edition for
> more than six months...
>
> 10.2  on the Expiry Date, or earlier subject to Clauses 3.2 and 3.3 hereof;
>
> 10.3  <u>if the Licensee fails to make any payment pursuant to Clause 6 of
> this Agreement within 28 days of the due date;</u>
>
> 10.4  upon written notice from the Licensor to that effect, if any material
> change occurs in the management or control of the Licensee;
>
> 10.5  if either of the parties fails to comply with any material term or
> condition of this Agreement and such failure, if capable of remedy,
> is not remedied within 28 days of receipt of a written notice of
> such failure from the other party.
>
> 10.6  if either party goes into liquidation..." (Emphasis added.)

**Varquin Defaults on Payment of the License Fees.**

        11.    On or about January 1, February 1 and March 1, 2007, Varquin timely

paid to Perry the monthly license fee instalments of $10,000 that were due under Clause 6.1 of

the License. However, on April 1, 2007, and to date, Varquin has failed to make the subsequent

monthly payment due on that date. More than 28 days have passed since that due date.

Varquin's failure to make that payment within 28 days alone triggered automatic termination

under Clause 10.3 of the License. In addition, the License also terminated by reason of

Varquin's failure to make the quarterly payment due on March 31, 2007, as described below.

12.    Varquin has also failed to pay Perry the next instalment payment of $10,000 which was due on May 1, 2007. (A monthly payment was due on May 1 because Clause 11.2 makes clear that Varquin's debt for certain license fees remains due after termination of the License.)

13.    Of the $240,000 that Varquin promised to pay Perry under Clause 6.1, it has only paid $30,000, leaving an unpaid balance of $210,000 plus interest under Clause 6.4.

**Varquin Also Failed to Make the Quarterly Payment due March 31, 2007.**

14.    Quarterly payments due under Clause 6.2 of the License on June 30, 2006, September 30, 2006 and December 30, 2006 were settled. However, Varquin failed to make the payment for the first quarter of 2007, which was due on March 31, 2007. The amount due was $8,619 and remains unpaid, along with interest accrued under Clause 6.4.

15.    On April 29, 2007, 28 days had passed without payment since the March 31, 2007 due date. The License therefore terminated automatically on April 29, 2007 under Clause 10.3.

**Post-termination Communications Between the Parties.**

16.    On May 3, 2007, I sent a letter to Varquin's director Adam Rodriguez, documenting the termination. A true and correct copy of this letter is attached hereto as Exhibit B. It states, "As stated in clause 10.3 ... we hereby terminate the agreement." As Clause 10.3 and my letter to Rodriguez make clear, Perry had no discretion whether the License would terminate in the event of Varquin's 28-day non-payment: 10.3 provides that the License terminates automatically in such event.

**Ongoing Violations by Varquin and Irreparable Harm.**

17.    Perry never authorized Varquin to publish a post-termination edition of Business Traveler. Perry has never authorized Varquin to register the domain name btusonline.com, which Varquin did register on May 10, 2007 just after receiving my letter notifying them that the License was terminated. Varquin thereafter started using that domain name, which presumably is short for Business Traveler United States Online. Perry never authorized Varquin to display the Marks and Business Traveler content on a website associated with that domain name, which Varquin now does. Perry never authorized Varquin to conduct Business Traveler business via "@btusonline.com" email addresses, which Varquin also now does.

18.    As documented in the accompanying Declaration of Toby Butterfield, Varquin has continued to use the Marks and the "btusonline.com" domain name despite termination of the License.

19.    Moreover, Varquin does not deny having plans to publish an unauthorized June edition of the North American Edition.

20.    Unless enjoined by this Court, Varquin's infringing activities, including the impending release of an unauthorized North American Edition of the Magazine, will cause irreparable harm to Perry.

**Varquin Has No Defense to Perry's Termination.**

21.    Based on pleadings contained in Varquin's ex parte application to New York State Court in this removed action, I anticipate that Varquin will blame its nonpayment on Perry by claiming that Perry did not sell enough advertising for the North American Edition, thus depriving Varquin of needed income. That argument holds no water and is in any case

6

irrelevant. It is true that Clause 4.8 states that Varquin "shall appoint [Perry] as [Varquin's] sales representative outside the Territory, and shall pay a commission of 20% to [Perry] on net advertising, sponsorship and subscription sales made by [Perry]... ." However, neither that Clause nor any other in the License imposed upon Perry an affirmative obligation to sell *any* advertisement for the North American Edition, let alone a particular quantity of advertisements.

22.    Moreover, Perry <u>did</u> sell many advertisements for the North American Edition. In 2006, Perry sold more advertisements into the North American Edition than in any of the previous five years, and 2007 seemed on track to break that record, as most of the prior advertisers had either already appeared in 2007, had booked to appear or were due to book an appearance in a 2007 edition.

**The Balance of Hardships Favors Perry.**

23.    Varquin cannot be heard to complain that an injunction against its use of the Marks would impose more hardship upon it than denial of the injunction would impose upon Perry. Varquin's unauthorized use of the Mark, especially via publication of an illicit North American Edition, would make it extremely difficult if not impossible for Perry to find a new licensee to publish an authorized North American Edition.

24.    Furthermore, many of the advertisers in the North American Edition also purchase advertising space in the U.K. Edition and other editions of the Magazine. Thus Perry's inability to control Varquin's unauthorized and entirely independent North American Edition would compromise Perry's ability to attract international advertisers.

25.    Varquin has been on notice of termination of the License since at least May 3, 2007, and it has been aware of its own nonpayment since March 31, 2007, as described above. The requested injunction would still allow Varquin, whose principals have experience in

the magazine industry, to publish a magazine about business travel so long as it did not use the Marks.

**Conclusion.**

      26.    For the above reasons and for the reasons described in the accompanying Memorandum of Law and Declaration of Toby M.J. Butterfield, the Court should grant an injunction restraining Varquin's further use of the Marks.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct and that this Declaration was executed on May 31, 2007 at Saint Jean De Luz, France.

JULIAN GREGORY

# EXHIBIT A

DATED: April 7, 2006

PERRY PUBLICATIONS LIMITED (1)

VARQUIN ENTERPRISES INC. (2)

---

**LICENCE AGREEMENT**
Business Traveler
North American Edition

---

AN AGREEMENT made on 7 April 2006

BETWEEN

(1)     PERRY PUBLICATIONS LIMITED (registered no. 770834) of 10 John Street, London, WC1N
        2EB ("the Licensor"); and

(2)     Varquin Enterprises Inc., 245 East 24th Street, Apartment 2G,  New York, NY 10010,  (the
        Licensee");

INTRODUCTION

(A)     The Licensor publishes a magazine entitled "Business Traveller" in the English language.

(B)     The Licensor has agreed to authorise the publication by the Licensee of a magazine under the title
        "Business Traveler" comprising material from the UK Magazine and the use of the Licensed
        Marks (defined below) in connection with such magazine, subject to the following terms and
        conditions.

IT IS AGREED as follows:

1.      DEFINITIONS

        In this Agreement:

1.1     *"Artworks"* means such of the photographs, drawings and other illustrative material
        published in the Magazine as shall be notified by the Licensor to the Licensee as
        available for publication in the North American Edition from time to time during the
        period of and in accordance with this Agreement;

1.2     *"the Expiry Date"* means 31st December 2008, or the date of termination under Clause 3.3;

1.3     *"the Intellectual Property"* means the Licensor's rights to the Licensed Marks.

1.4     *"the Licensed Marks"* means the Trade Marks listed in the First Schedule;

1.5     *"the Material"* means the articles and other editorial material selected from and published by the
        Licensor in the Magazine.

1.6     *"the Magazine"* means all or any of the magazines published by the Licensor under the title
        "Business Traveller" in the UK and Asia/Pacific markets;

1.7     *"the North American Edition"* means the magazine published by the Licensee under the title
        "Business Traveler," any supplements published in association with such magazine and the
        website www.businesstravelerusa.com;

1.8     *"the Term"* means the term of this Agreement specified in Clause 3;

2

1.9   *"the Territory"* means North America, including the U.S. and Canada and their territories and possessions.

1.10   *"working day"* means any day on which banks in the City of London are open for business;

1.11   Headings contained in this Agreement are for reference purposes only and should not be incorporated into this Agreement and shall not be deemed to be any indication of the meaning of the clauses and sub-clauses to which they relate.

2.   LICENCE

2.1   The Licensor hereby grants to the Licensee the exclusive licence during the Term:

2.1.1   to reproduce the Material for publication in the North American Edition; and

2.1.2   to use the Licensed Marks for the purposes of publishing, distributing, marketing and promoting ("exploiting") the North American Edition under or by reference to the Licensed Marks throughout the Territory on the terms of this Agreement.

2.2   Provided that the Licensee shall not reproduce, make use, authorise or permit the reproduction or use of, any of the Material or the Artworks or transparencies thereof (other than pursuant to the rights granted under this Agreement) without the prior written consent of the Licensor in accordance with this Agreement.

3.   TERM

3.1   This Agreement shall be deemed to commence on the date hereof ("the Commencement Date") and shall continue until the Expiry Date, subject to prior termination as provided in Clause 3.3 or Clause 10.

3.2   On the Expiry Date, the Licensor will, at the reasonable expense of the Licensee, transfer to the Licensee ownership of the Intellectual Property and the domain name www.businesstravelerusa.com, subject to the payment of the fees agreed in Clause 6 and the payment by Licensee of the additional consideration of Ten Dollars ($10.00). For the avoidance of doubt, the provisions of this Clause 3.2 shall not apply in the case of any termination under Clause 10.

3.3   The Licensee may terminate this Agreement on giving not less than 30 working days written notice to expire on any date on or after 1 July 2008 subject to the Licensee paying to the Licensor on or before the termination date specified in the notice a sum equal to the balance (if any) of the Licence fee specified in Clause 6.1 remaining unpaid plus the additional consideration of Ten Dollars ($10.00), in which event the transfers specified in Clause 3.2 shall be effective as of the date of termination pursuant to this Clause 3.3.

4    OBLIGATIONS OF LICENSOR

4.1    The Licensor shall provide to the Licensee throughout the term of this Agreement as soon as reasonably practicable, one copy of each issue of the Magazine.

4.2    The Licensor shall, as far as is practicable, provide to the Licensee the editorial schedule for the forthcoming issues of the Magazine. The Licensor will provide to the Licensee, in a timely manner, an electronic copy of those articles requested for publishing in the North American Edition. The Licensor will also provide copies of photographs and illustrations, where the necessary consents have been obtained from the copyright holders, when requested by the Licensee.

4.3    The Licensor shall work with and assist the Licensee in 2006 on the Business Traveler Awards and Silent Auction.

4.4    The Licensor shall provide, if requested by the Licensee, completed editorial, advertising and design content for the May 2006, June 2006, July/August 2006 and September 2006 issues and send files electronically to the Licensee's printer in a form suitable for printing. The Licensee shall, in addition to the fee payable under Clause 6.1, pay to the Licensor a further fee, which at the Licensee's option (the Licensor to be notified in writing at least eight weeks before the date of publication of an issue) shall be either (i) US$13,000 per issue, in respect of the cost of such editorial content, with the exception of any editorial content written by the Licensor at the specific request of the Licensee ("the Special Content"), for which a separate fee shall be agreed, or (ii) a fee to be calculated on an "a la carte" basis with editorial content reproduced by the licensee charged at a rate of US$0.20 per word.

4.5    The Licensor shall provide, if requested by the Licensee, completed editorial, advertising and design content for the October 2006 through December 2007 issues (inclusive) and send files electronically to the Licensee's printer in a form suitable for printing. The Licensee shall, in addition to the fee payable under Clause 6.1, pay to the Licensor a further fee, which at the Licensee's option (the Licensor to be notified in writing at least eight weeks before the date of publication of an issue) shall be either (i)US$21,000 per issue to include the cost of such editorial content, except any Special Content for which a

separate fee shall be agreed, or (ii) a fee to be calculated on an "a la carte" basis, with editorial content reproduced bt the licensee charged at a rate of US$0.20 per word.

4.6    The Licensor shall provide, if requested by the Licensee, completed editorial, advertising and design content for the Four-Hour Guide in September 2006 and September 2007 and send files electronically to the Licensee's printer in a form suitable for printing. The Licensee shall pay the Licensor a fee of US$3,000 per edition to reproduce and publish such editorial content, with the exception of any Special Content for which a separate fee will be agreed.

4.7    The Licensor shall ensure that the North American Edition is included in the global media kit to be used by all the Licensor's sales staff and representatives throughout the world.

4.8    The Licensee shall appoint the Licensor as the Licensee's sales representative outside the Territory, and shall pay a commission of 20% to the Licensor on net advertising, sponsorship and subscription sales made by the Licensor, such commission to include any sales representative's commission with the [usual] representation, sales and commission terms to apply.

4.9    The Licensor shall not sell the Magazines on newsstands in the Territory, nor shall the Licensor license anyone else to do so.

4.10    The Licensor shall assist the Licensee in the distribution of weekly email newsletters until 31 December 2007, for which service Licensee will pay Licensor a fee of US$100 per newsletter.

4.11    The Licensor warrants to the Licensee that the Licensee will have no liability in respect of the publication of Business Traveler (i.e., the North American Edition) prior to and including the February 2006 issue.

4.12    The Licensor shall provide the Licensee with 6 complimentary full pages of advertising each year for the sole purpose of barter advertising in respect of Business Traveller awards.

4.13    The Licensor will make available to the Licensee the full use of the url www.businesstravelerusa.com during the Term.

4.14    The Licensor will provide the Licensee with up to US$25,000 of barter credits with Intagio for the sole purpose of printing stationery to facilitate the establishment by

Licensee of its New York offices; the Licensee shall make all arrangements for printing and liaison with Intagio.

4.15    The Licensor will provide the Licensee with advice and assistance in 2006 in respect of the ABC audit and distribution of the North American Edition.

4.16    The Licensor will supply to the Licensee one computer with Quickfill software containing all existing subscriber details.

OBLIGATIONS OF LICENSEE

The Licensee agrees with the Licensor:

5.1    to ensure that a copyright notice in a form first to be agreed by the parties appears on the contents page of all copies of the North American Edition;

5.2    to send to the Licensor on publication 10 free copies of each issue of the North American Edition;

5.3    to allow the Licensor to reproduce and publish in the Magazine such editorial copy as the Licensee permits and selects from the North American Edition at a cost of $0.20c per word.

5.4    that it shall act as the Licensor's sales representative for the Territory (except those areas already covered by Licensor's sales representatives). A commission of 20% will be payable (including any sales representatives' commission) on net advertising, sponsorship and subscription sales made by the Licensee;

5.5    that it will be responsible for fulfilling all current subscriptions for the North American Edition until they expire;

5.8    that it shall not sell the North American Edition on newsstands outside the Territory;

5.9    that it shall provide the Licensor with 6 complimentary pages of advertising each year.

5.10    subject to the Licensor fulfilling its obligations under Clause 4.17, to fulfil all unfulfilled subscriptions for the North American Edition.


6.    ROYALTY AND FEES

6.1    In consideration of the licence granted herein, the Licensee shall pay to the Licensor the sum of US$240,000, payable in 24 monthly instalments of US$10,000, the first instalment to be paid on 1 January 2007.

6.2    Settlement for all other payments due from the Licensee to the Licensor will be made quarterly, on 30 June, 30 September, 30 December and 31 March in each year, with the first payment to be made on 30 June 2006.

6.3   The Licensee will remit all payments to Perry Publications at Lloyds TSB Bank PLC, sort code: 30-12-18, account name: Perry Publications Limited, account no: 11393219, or such account as the Licensor shall nominate in writing;

6.4   In the event of any payment of any money due to the Licensor under the terms of this Agreement more than 10 days after the due date, the Licensee shall pay to the Licensor interest accruing from day to day calculated at the annual rate of 2% above the base rate from time to time of National Westminster Bank plc on any such money unpaid from the due date for payment until the actual date of payment.

7.    **INDEMNITY OF LICENSEE**

7.1   The Licensee will keep the Licensor fully indemnified against all losses and all actions, claims, costs, damages and proceedings (including any damages or compensation paid by the Licensor) which may be brought or made against the Licensor arising out of the publication of the North American Edition by or on behalf of the Licensee and attributable to the act or default or failure of the Licensee, provided that in the event of any such claim being made the Licensor will not make any admission of liability, but will forthwith hand over the conduct and control of such claim to the Licensee with full power to use the name of the Licensor to defend any action and take such steps therein, including the settling of any such claim or action, as the Licensee at its reasonable discretion thinks fit. The Licensee shall in dealing with any such claim consult with the Licensor in a manner and to an extent appropriate to that claim, provided that the indemnity in this Clause 7.1 shall not apply in the case of any actionable matter caused by the breach, default or failure of the Licensor or arising from content supplied by the Licensor.

8.    **WARRANTY AND INDEMNITY OF LICENSOR**

8.1   The Licensor warrants to the Licensee that the Licensor is the sole owner of the rights herein granted, that the reproduction or authorised reproduction of any Material or Artworks pursuant to this Agreement will in no way whatever violate or infringe any existing copyright or third-party right, including but not limited to third parties' rights of privacy, and that the Material and Artworks do not contain anything defamatory or otherwise actionable.

8.2   The Licensor will indemnify and keep the Licensee fully indemnified against all actions, suits, proceedings, claims, demands or damages occasioned to the Licensee in consequence of any breach of the above warranties by the Licensor, provided that in the event of any such claim being made, the Licensee will not make any admission of liability, but will forthwith hand over the conduct and control of such claim to the Licensor with full power to use the name of the Licensee

to defend any action and to take such steps therein, including the settling of any such claim or action, as the Licensor at its reasonable discretion thinks fit. The Licensor shall in dealing with any such claim consult with the Licensee in a manner and to an extent appropriate to that claim. The indemnity in this Clause 8.2 shall not apply in the case of any actionable matter caused by the breach, default or failure of the Licensee.

9.    RIGHTS IN THE LICENSED MARKS AND COPYRIGHT

9.1    The Licensee hereby agrees and undertakes to use the Intellectual Property only in the Territory on or in relation to the North American Edition, for the purpose of exercising its rights and performing its obligations under this Agreement.

9.2    The Licensee shall not during the Term use the Intellectual Property in any way which might prejudice their distinctiveness or validity.

9.3    Except as provided herein, the Licensee shall not have ownership of the Intellectual Property, and the Licensee hereby acknowledges that it shall not acquire any such ownership rights in respect thereof and that all such rights  are and shall remain vested in the Licensor, subject to the provisions of Clause 3.2.

9.4    The Licensee shall at the expense of the Licensor take all such steps as the Licensor may reasonably require to assist the Licensor in maintaining the validity and enforceability of the Intellectual Property during the Term.

9.5    The Licensee shall promptly and fully notify the Licensor of any actual, threatened or suspected infringement in the Territory of the Intellectual Property or the rights in any Artworks which comes to the Licensee's notice, and of any claim by any third party coming to its notice, that the sale of the North American Edition in the Territory infringes any rights of any other person, and the Licensee shall at the request and expense of the Licensor do all such things as may be reasonably required to assist the Licensor in taking or resisting any proceedings in relation to any such infringement or claim.

10.    TERMINATION

This Agreement shall terminate:

10.1    if the Licensee fails to publish the North American Edition for more than six months without material plans and measures to resume publication;

10.2    on the Expiry Date, or earlier subject to Clauses 3.2 and 3.3 hereof;

10.3    if the Licensee fails to make any payment pursuant to Clause 6 of this Agreement within 28 days of the due date;

10.4    upon written notice from the Licensor to that effect, if any material change occurs in the management or control of the Licensee;

10.5    if either of the parties fails to comply with any material term or condition of this Agreement and such failure, if capable of remedy, is not remedied within 28 days of receipt of a written notice of such failure from the other party, or

10.6    if either party goes into liquidation, either compulsory or voluntary (save for the purpose of solvent reconstruction or amalgamation), if a receiver or manager is appointed in respect of the whole or any part of either of party or of its assets, or if either party makes any assignment for the benefit of or composition with its creditors generally or threatens to do any of these things, or under the law of any jurisdiction, anything occurs analogous to any of such events.

11.    **AFTER TERMINATION**

Following the termination of this Agreement under Clause 10.1 or by the Licensor under Clause 10.3 to 10.6 inclusive:

11.1    the Licensee shall not thereafter publish or authorise the publication of any publication under the title the Business Traveler or including such title or any title confusingly similar to such title.

11.2    Clauses 6, 7, 8, 9, and 11 shall each continue in force in accordance with their terms.

12.    **MISCELLANEOUS**

12.1    The Licensee may not assign, charge or otherwise deal with this Agreement or any of the rights granted without the previous written consent of the Licensor. The Licensor may assign, charge or otherwise deal with this Agreement or any of its rights or obligations without the previous written consent of the Licensee, and shall give written notice of any such assignment to the Licensee.

12.2    Each of the parties warrants it has power to enter into this Agreement and has obtained all necessary approvals to do so.

12.3    The receipt of money by either of the parties shall not prevent either of them from questioning the correctness of any statement in respect of any money.

12.4    In the event of national emergency, war or prohibitive governmental regulations, or if any other cause beyond the reasonable control of the parties renders performance of the Agreement impossible for a period of 2 calendar months, all parties will be released from their respective obligations whereupon:

12.4.1    all money due to the Licensor will be paid within 30 days of such event

12.4.2    the Licensee shall forthwith cease to use the names "Business Traveler" and "Business Traveller International", the Material and the Artwork.

The parties acknowledge that this Agreement contains the whole agreement between the parties and it has not relied upon any oral or written representations made to it by the other or its employees or agents. Neither of the parties shall have any right of action against the other party arising out of or in connection with any such representation (except in the case of fraud).

12.6    This Agreement supersedes any prior agreement between the parties, whether written or oral, and any such prior agreements are cancelled as at the Commencement Date but without prejudice to any rights which have already accrued to either of the parties.

12.7    Each of the parties shall give notice to the other of change of any address or telephone or similar number as soon as practicable.

12.8    Any notice, consent or the like, to be served on either of the parties by the other shall be in writing and delivered personally to a director of the party to be served or sent by prepaid courier such as FedEx or a comparable service, to the address of the party to be served set out above, or such other address as shall have been notified in accordance with this clause.

12.9    The parties are not partners, nor is the Licensee able to act as agent for the Licensor save as authorised by this Agreement.

12.10   This agreement shall be governed and interpreted by the laws of the United States and the relevant law of New York State England and all disputes unless otherwise agreed will be subject to the -exclusive jurisdiction of the state and federal courts located within the City of New York, County of New York.

12.11   The failure by either party to enforce at any time or for any period any one or more of the terms or conditions of this Agreement shall not be a waiver of them or of the right at any time thereafter to enforce all terms and conditions of this Agreement.

12.12   Each of the parties shall pay the costs and expenses incurred by it in connection with this Agreement.

12.13   Each of the parties agrees that each shall bear its own liability for any taxation chargeable in the United Kingdom or elsewhere (including VAT or similar tax) arising under this Agreement and each undertakes to indemnify the other in respect of any such taxation assessed on and paid by the other in respect of which the other is primarily liable.

12.14   The provisions hereof shall be binding on the parties' respective permitted assigns.

12.15   This Agreement may be executed in counterparts, each of which shall be an original but such counterparts taken together shall constitute one and the same agreement.

12.16   The Parties agree to keep all terms of this Agreement secret and confidential, and not to make any announcement relating to it without the prior written consent of the other.

AS WITNESS the hands of the duly authorised representative of the parties the day and year first before written.

11

## THE FIRST SCHEDULE

**Business Traveler**



Trade Mark

Business Traveler – Class 16 – Reg No. 1372466

Business Traveler International– Class 16 – Reg No. 1784071

SIGNED by JULIAN GREGORY        )
for and on behalf of            )
PERRY PUBLICATIONS              )
LIMITED                         )


SIGNED by ADAM RODRIGUEZ        )
for and on behalf of            )
VARQUIN ENTERPRISES INC         )

04/12/06

# EXHIBIT B



2nd Floor, Cardinal House,
39-40 Albemarle Street,
London, W1S 4TE
www.businesstraveller.com

Tel: +44 (0)20 7647 6330
Tel: +44 (0)20 7647 6360 (Advertising)
Tel: +44 (0)20 7647 6353 (Editorial)
Tel: +44 (0)844 477 0043 (Subscriptions)
Fax: +44 (0)20 7647 6331

Adam Rodriguez
Director, North America
Varquin Enterprises Inc
303 Fifth Avenue
Suite 1306
New York
NY 10016-6601

Thursday 3rd May 2007

Dear Adam

As stated in clause 10.3 of the licence agreement between PERRY PUBLICATIONS
LIMITED and VARQUIN ENTERPRISES INC we hereby terminate the agreement.

Yours Sincerely

Julian Gregory
Managing Director

Perry Publications Ltd. Registered Office: 10 John Street, London, WC1N 2EB
Registered in England No.770834 GB VAT No. 868 1406 07