UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VARQUIN ENTERPRISES INC., a New York corporation,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>PERRY PUBLICATIONS LIMITED, a United Kingdom corporation,<br><br>　　　　　　　　　　　　Defendant. | No. 07-cv-3953 (LBS) |

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR PRELIMINARY
INJUNCTION AND TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

I. INTRODUCTION AND FACTUAL BACKGROUND ................................................ 1

    Payment Provisions of the License ................................................................... 3

    Termination Provisions of the License .............................................................. 3

    Varquin Defaults on Payment of the License Fees ........................................... 4

    Varquin Also Failed to Make the Quarterly Payment due March 31, 2007 ..... 4

    Post-termination Communications Between the Parties ................................... 5

    Ongoing Violations by Varquin and Irreparable Harm ..................................... 5

II. PERRY IS ENTITLED TO A PRELIMINARY INJUNCTION ................................. 6

    A.    The Standard for a Preliminary Injunction ......................................... 6

    B.    Irreparable Harm is Presumed ............................................................. 7

    C.    Perry Is Likely to Succeed on Its Trademark Infringement Claim ..... 9

        1.    Perry's Trademarks Are Registered and Distinctive ............. 10

        2.    Confusion is Presumed As a Matter of Law ......................... 11

    D.    The Balance of Hardships Favors Perry ........................................... 12

III. CONCLUSION ........................................................................................................... 15

Defendant-counterclaimant Perry Publications Ltd. ("Perry") respectfully submits this Memorandum of Law in Support of its Motion for a Preliminary Injunction and Temporary Restraining Order. A temporary restraining order and preliminary injunction are necessary to prevent Plaintiff-counterclaim defendant Varquin Enterprises Inc. ("Varquin"), whose license to use certain of Perry's trademarks was terminated due to Varquin's nonpayment, from publishing a magazine using Perry's registered trademark BUSINESS TRAVELER and otherwise using Perry's marks without authorization to promote Varquin's business. Varquin's illegal conduct threatens irreparable harm, warranting the Court's immediate intervention.

## I. INTRODUCTION AND FACTUAL BACKGROUND

Since 1976, Perry has published Business Traveller (the "Magazine") in various media markets around the world. The Magazine is the best-selling business travel magazine, and is written for discerning travelling businessperson who seeks an independent view of worldwide travel issues. The Magazine and businesstraveller.com website provide up-to-the-minute information on all aspects of travel: airlines, airports, hotels, car rentals and more. The website covers topical issues such as health, security, gadgets and leisure recommendations, and features tools for airline and hotel reservations. In addition, subscribers to Business Traveller TravelPlan have access to timetables for scheduled flights worldwide, regularly updated city guides, and other useful information. See accompanying Declaration of Julian Gregory ("Gregory Dec."), ¶ 3.

Either directly or via licenses and joint ventures, Perry publishes numerous editions of Business Traveller magazine. Business Traveller was first published in the U.K. in 1976. Today there are nine editions: U.K. and Europe (the "U.K. Edition"), Germany, the Middle East, Asia-Pacific, China, Hungary, Spain, South Africa and Denmark. Collectively, Business Traveller distributes monthly up to 320,000 copies of the various editions of the

1

Magazine throughout the world. Prior to the termination of the U.S.-based edition in issue in this case (the "North American Edition"), that maximum was well over 500,000 distributed copies. Id., ¶ 4.

The Business Traveller is also world-famous for its annual Business Traveller Awards, a star-studded international competition that recognizes outstanding achievement in business travel. At the awards ceremonies, which take place in different countries including the United States, high-profile presenters attend and present awards, garnering considerable media attention. Past presenters have included Princess Diana, Sam Donaldson, actress Sarah Jessica Parker, Princess Anne, astronaut Buzz Aldrin, and Queen Rania of Jordan. Id., ¶ 5.

By reason of the Magazine's success in various media markets worldwide, consumers in the United States and elsewhere associate Perry with the Marks BUSINESS TRAVELER and BUSINESS TRAVELER INTERNATIONAL (the "Marks"). Id., ¶ 6.

Perry is also the owner of various trademark registrations for the trademarks BUSINESS TRAVELLER and/or BUSINESS TRAVELER (depending on the most accurate spelling of the title of the Magazine in the various jurisdictions where it appears) and permutations thereof. In the United States, Perry owns all right, title and interest in and to the trademark BUSINESS TRAVELER (Reg. No. 1372466 issued on November 26, 1985 by the United States Patent and Trademark Office) and BUSINESS TRAVELER INTERNATIONAL (Reg. No. 1784071 issued on July 27, 1993). Id., ¶ 6.

By agreement dated April 7, 2006 (the "License"), a true and correct copy of which is annexed to the Gregory Dec. as Exhibit A, Perry granted to Varquin the limited right to publish the North American Edition, which had previously been published by another licensee. Under the License, Varquin had the right to incorporate articles and other materials from the

U.K. Edition into the North American Edition alongside content generated by Varquin specifically for the North American Edition, subject to both Perry's consent and Varquin's payment for rights to the U.K. Edition material. Gregory Dec., ¶ 8.

**Payment Provisions of the License.**

The payment terms of the License are simple, and appear in the License as follows:

> "6.1   In consideration of the licence granted herein, the Licensee shall pay to the Licensor the sum of US $240,000, payable in 24 monthly instalments of US $10,000, the first instalment to be paid on 1 January 2007.
>
> 6.2   Settlement for all other payments due from the Licensee to the Licensor will be made quarterly, on 30 June, 30 September, 30 December and 31 March in each year, with the first payment to be made on 30 June 2006."

The "other payments" to which Clause 6.2 refers include the fees for use of material from the U.K. Edition, and are described elsewhere in the License. Id., ¶ 9, Ex. A.

**Termination Provisions of the License.**

The termination provisions of the License are equally simple. The License states that it terminates automatically upon any of five enumerated occurrences (Clauses 10.1, 10.2, 10.3, 10.4 and 10.6). In addition, the License also may terminate if there is any other material breach and the breaching party fails to cure within 28 days after notice in writing. (Clause 10.5). The clause states that termination occurs:

> "10.1   if the Licensee fails to publish the North American Edition for more than six months...
>
> 10.2   on the Expiry Date, or earlier subject to Clauses 3.2 and 3.3 hereof;
>
> 10.3   <u>if the Licensee fails to make any payment pursuant to Clause 6 of this Agreement within 28 days of the due date;</u>

3

      10.4    upon written notice from the Licensor to that effect, if any material change occurs in the management or control of the Licensee;

      10.5    if either of the parties fails to comply with any material term or condition of this Agreement and such failure, if capable of remedy, is not remedied within 28 days of receipt of a written notice of such failure from the other party.

      10.6    if either party goes into liquidation…" (Emphasis added.) Id., ¶ 10, Ex. A.

**Varquin Defaults on Payment of the License Fees.**

On or about January 1, February 1 and March 1, 2007, Varquin timely paid to Perry the monthly license fee instalments of $10,000 that were due under Clause 6.1 of the License. However, Varquin has failed to make the subsequent monthly payment due on April 1, 2007. More than 28 days have passed since that due date. Varquin's failure to make that payment within 28 days alone triggered automatic termination under Clause 10.3 of the License. In addition, the License also terminated by reason of Varquin's failure to make the quarterly payment due on March 31, 2007, as described below. Id., ¶ 11.

Varquin has also failed to pay Perry the next monthly instalment payment of $10,000, which was due on May 1, 2007. (A monthly payment was due on May 1 because Clause 11.2 makes clear that Varquin's debt for the Clause 6.1 license fee remains due after termination of the License.) Id., ¶ 12, Ex. A.

Of the $240,000 that Varquin promised to pay Perry under Clause 6.1, it has only paid $30,000, leaving an unpaid balance of $210,000 plus interest under Clause 6.4. Id., ¶ 13, Ex. A.

**Varquin Also Failed to Make the Quarterly Payment due March 31, 2007.**

Quarterly payments due to Perry under Clause 6.2 of the License on June 30, 2006, September 30, 2006 and December 30, 2006 were settled. However, Varquin failed to

4

make the payment for the first quarter of 2007, which was due on March 31, 2007. The amount due was $8,619 and remains unpaid, along with interest accrued under Clause 6.4. Id., ¶ 14, Ex. A.

On April 29, 2007, 28 days had passed without payment since the March 31, 2007 due date. The License therefore terminated automatically on April 29, 2007 under Clause 10.3. Id., ¶ 15, Ex. A.

**Post-termination Communications Between the Parties.**

On May 3, 2007, Mr. Gregory (Perry's Managing Director) sent a letter to Varquin's director Adam Rodriguez, documenting the termination. It states, "As stated in clause 10.3 ... we hereby terminate the agreement." As Clause 10.3 and Mr. Gregory's letter to Mr. Rodriguez make clear, Perry had no discretion whether the License would terminate in the event of Varquin's 28-day non-payment: Clause 10.3 provides that the License terminates automatically in such event. Id., ¶ 15, Exs. A, B.

**Ongoing Violations by Varquin and Irreparable Harm.**

Perry never authorized Varquin to publish a post-termination edition of Business Traveler. Perry has never authorized Varquin to register the domain name btusonline.com, which Varquin did register on May 10, 2007 just after receiving Mr. Gregory's letter notifying it that the License was terminated. Varquin thereafter started using that domain name, which presumably is short for Business Traveler United States Online. Perry never authorized Varquin to display the Marks and Business Traveler content on a website associated with that domain name, which Varquin now does. Perry never authorized Varquin to conduct Business Traveler business via "@btusonline.com" email addresses, which Varquin also now does. Id., ¶ 17. See also accompanying Declaration of Toby Butterfield dated May 31, 2007 ("Butterfield Dec."),

5

¶ 13, Ex. D. Varquin registered this domain after receiving notice of the termination of the License, and has started using the Marks in its website at that location. This is a naked attempt by Varquin to continue using the Marks despite the termination, even if Perry exercises its right to disable the businesstravelerusa.com domain, which Perry controls. Compare Butterfield Dec., ¶¶ 14, 15, Exs. D (businesstravelerusa.com website) with id., Ex. G (identical website established by Varquin in May 2007). Unless enjoined, Varquin apparently plans to use the Marks and the "btusonline.com" domain for up to 10 years, despite termination of the License. Butterfield Dec., ¶ 16, Ex. F.

Varquin does not even deny having plans to publish an unauthorized June edition of the North American Edition, Gregory Dec., ¶ 19, and indeed has given every indication that it is on the brink of doing so. Butterfield Dec., ¶¶ 5-7. Unless enjoined by this Court, Varquin's infringing activities, including the impending release of an unauthorized North American Edition of the Magazine, will cause irreparable harm to Perry. Gregory Dec., ¶¶ 20, 23-24.

## II.  PERRY IS ENTITLED TO A PRELIMINARY INJUNCTION.

### A.  The Standard for a Preliminary Injunction.

To obtain a preliminary injunction under Fed. R. Civ. P. 65, a party must demonstrate: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 192 (2d Cir. 2004) (quoting Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 96 (2d Cir. 2002)); Random House, Inc. v. Rosetta Books LLC, 283 F.3d 490, 491 (2d Cir. 2002); Merit Diamond Corp. v. Frederick Goldman, Inc., 376 F. Supp. 2d 517, 2005 U.S. Dist. LEXIS 14271 at *11 (S.D.N.Y. July 13, 2005). In this case, the infringement of Perry's intellectual property rights results in

irreparable injury, and Perry is very likely to succeed on the merits of its claims against Varquin. Varquin therefore should be enjoined from distributing magazines bearing the Marks or otherwise using the Marks.

**B.    Irreparable Harm is Presumed.**

Irreparable harm is presumed in trademark and copyright cases where infringement is established. Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 967-68 (2d Cir. 1995); Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254 (2d Cir. 1987); Robot Wars LLC v. Roski, 1999 WL 397492, * 2 (S.D.N.Y. June 15, 1999); Casa Editrice Bonechi, S.R.L. v. Weisdorf & Co., 1995 U.S. Dist. LEXIS 12849 (S.D.N.Y. Sept. 6, 1995) (Schwartz, J.); Merkos L'Inyonei Chinuch, Inc., 312 F.3d at 96; ABKCO Music, Inc. v. Stellar Records, Inc., 96 F.3d 60, 64 (2d Cir. 1996); Hasbro Bradley, Inc. v. Sparkle Toys, Inc., 780 F.2d 189, 192 (2d Cir. 1985) ("Irreparable harm may ordinarily be presumed from copyright infringement") (citations omitted). As explained below, even without this presumption, Perry can easily demonstrate irreparable harm, as Varquin is threatening to usurp Perry's exclusive right to publish magazines using the Marks, harming the Marks and their goodwill with consumers, and effectively preventing Perry from exploiting the Marks itself or from finding another licensee to publish an authorized North American Edition of the Magazine.

It is well settled that a showing of irreparable harm is "perhaps the single most important prerequisite for issuance of a preliminary injunction." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (quoting Bell & Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983)). Irreparable injury is "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Roderiguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999).

The Second Circuit has repeatedly held that unauthorized use of intellectual property by a former licensee results in a presumption of irreparable harm precisely because the owner loses control over its reputation and the goodwill in its property. Church of Scientology Int'l v. Elmira Mission of Church of Scientology, 794 F.2d 38, 44 (2d Cir. 1986) (reversing, and granting injunction in trademark action against former licensee); Kamikazi Music Corp. v. Robbins Music Corp., 684 F.2d 228, 230 (2d Cir. 1982) (finding copyright infringement after license expired).

As a copyright and trademark holder, Perry is, of course, entitled to exclusive control over the distribution of its intellectual property, subject to its contractual agreements. Church of Scientology, 794 F.2d at 43. As described above, Varquin failed to pay Perry the required fees due under the License on April 1, 2007, and the License therefore terminated according to its terms on April 29, 2007, 28 days later.[1] Varquin is therefore a terminated, infringing licensee, and absent this Court's order, Varquin's exploitation of the Marks will result in irreparable injury to Perry as a matter of law.

Even in the absence of the legal presumption, irreparable harm exists because a hostile party with the power and motive to harm Perry's intellectual property is continuing to exploit the Marks and threatens to publish an additional unauthorized edition of a magazine using one of the Marks as its title.

Finally, putting aside both the legal presumption and Varquin's demonstrated hostility to Perry, irreparable injury is likely in the absence of the limited interim relief sought. Perry now needs to locate a new licensee for the Marks and a new publisher for the North American Edition of the Magazine. No publisher will agree or even negotiate to publish the

---

[1]  Varquin has also failed to make several other payments due under the License, each of which is also more than 28 days past due. Gregory Dec., ¶¶ 12-15. Any one of these additional defaults would alone trigger automatic termination of the License.

8

Magazine in the United States if plaintiff is permitted to proceed with its unauthorized edition. Customers' positive associations with the Marks will be harmed and may be destroyed by Varquin's unauthorized version of the Magazine—a classic case of irreparable harm. The magazine industry is notorious for the speed with which a publication can win new readers and advertisers, only to see that customer and advertiser loyalty disappear if compelling and smart editions of a magazine do not continue to appear regularly in bookstores, newsstands and in subscribers' mailboxes. The need for interim protection cannot be overstated.[2]

### C. Perry Is Likely to Succeed on Its Trademark Infringement Claim.

A licensor of copyright and trademark rights has "a particular interest in controlling the use of its mark by its licensees in order to preserve the mark's quality and its continued vitality." Church of Scientology Int'l, 794 F.2d at 43; Kamikazi Music Corp., 684 F.2d at 230.

Perry exercised its contractual right to terminate the License. Perry was not required to provide a period of notice, or notice of breach, nor an opportunity for Varquin to cure. Gregory Dec., Ex. A, Clause 10.3. Indeed, such requirements would be pointless here.

By the plain language of the provision, Perry need not wait to suffer <u>actual</u> detriment. Nor need it believe the detriment to be <u>likely</u> to occur. Instead, the License terminated automatically on Varquin's non-payment. Gregory Dec. ¶¶ 11, 12 (non-payment), Ex. A, Clause 10.3 (automatic termination for non-payment).[3]

---

[2]  By contrast, plaintiff Varquin can suffer no conceivable injury from the injunction sought, much less "substantial injury." It remains free to publish other magazines under other non-infringing titles. In any event, if there were any injury that might conceivably accrue to Varquin as a result of an injunction, such injury is fully compensable in money damages.

[3]  Indeed, Perry's right to terminate is accorded such deference for the same reason a copyright and trademark holder has exclusive control over the exploitation and distribution of its property: to ensure that no irreparable harm occurs. See, e.g., American Metropolitan Enterprises v. Warner Bros. Records, 389 F.2d 903, 905 (2d Cir. 1968) (copyright holder presumed to suffer irreparable harm "when his exclusive use of the copyrighted material is

9

As a matter of law, upon termination of the License, Varquin has no further right to reproduce or distribute magazines using Perry's Marks. Any such continuing reproduction, distribution or use constitutes copyright and trademark infringement. Church of Scientology Int'l, 794 F.2d 38, 44-45; The Southland Corp. v. Froelich, 41 F. Supp.2d 227, 243 (E.D.N.Y. 1999) ("use of the mark after termination of the licensing agreement, by definition, constitutes trademark infringement.") (citation omitted); see also Encyclopedia Brown Productions, Ltd. v. Home Box Office, 1994 U.S. Dist LEXIS 21372 at *21 (S.D.N.Y. August 24, 1994) (finding copyright infringement where distributor exhibited pilot beyond period permitted on contract). To stop infringing, Varquin must cease exploiting the Marks and acknowledge Perry's exclusive rights to use them on and in connection with magazines. As fully analyzed below, Perry is likely to succeed on the merits of its trademark claims.

### 1. Perry's Trademarks Are Registered and Distinctive

To succeed on a claim under the Lanham Act, Perry must establish that the Marks are valid and protectible and have been infringed. 15 U.S.C. §1114(a). This test is met by a determination that: (i) the trademarks are inherently distinctive or have acquired distinctiveness through secondary meaning; (ii) the marks are non-functional; and (iii) purchasers are likely to confuse the infringing product with the original. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992). Each element is presented here.

In Two Pesos, the Supreme Court held that a mark is inherently distinctive "if it is capable of identifying products ... as coming from a specific source." 505 U.S. at 773. Arbitrary marks comprise those words which are in common linguistic use but which, when used with the

---

invaded"); Abko Music, Inc. v. Abko Music and Records, Inc., 96 F.3d 60, 64 (2d Cir. 1996) (citing Warner Bros. Records).

goods or services in issue, neither suggest nor describe any ingredient, quality or characteristics of those goods. 1 McCarthy § 11:4 at 11-9.

Perry's Marks should be classified as inherently distinctive because they are fanciful and arbitrary as applied to magazines. The Marks are thus protectable without regard to proof of secondary meaning. Two Pesos, 505 U.S. at 769, 112 S. Ct. at 2757; see also 1 McCarthy § 11.21[1] at 108-09. The registration of Perry's marks, Gregory Decl.,¶ 7, is prima facie evidence of ownership and distinctiveness.[4] The success of the marks, including the widespread media coverage for the Magazine, and the range of editions thereof, all demonstrate the distinctiveness of the Marks to consumers. Gregory Decl., ¶¶ 3-7. This means the Marks have acquired distinctiveness, or secondary meaning, because a substantial number of present or prospective customers understand the Marks as referring to the particular entity that holds the Marks. See Yarmuth-Dion, Inc. v. D'Ion Furs, Inc., 835 F.2d 990 (2d Cir. 1987); Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183, n.16 (5th Cir. 1980), cert. denied, 450 U.S. 981 (1981).

2. **Confusion is Presumed As a Matter of Law**

Likelihood of confusion is the sine qua non of actions under Sections 1114 and 43(a) of the Lanham Act. The test is whether "there is a likelihood that an appreciable number of ordinarily prudent purchasers would be confused as to the source of goods ... or in distinguishing one product from another." Miller Brewing Co. v. Carling O'Keefe Breweries Ltd., 452 F. Supp. 429, 444 (W.D.N.Y. 1978); Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190 (2d Cir. 1971).

---

[4] Once a mark has been granted registration by the U.S. Patent and Trademark Office, the registrant is entitled to a statutory presumption that the registrant owns the mark in question and that the registrant has the exclusive right to use the mark in commerce. 15 U.S.C. § 1115(a); Lane Capital Management, Inc. v. Lane Capital Management, Inc., 192 F.3d 337, 345 (2d Cir. 1999).

11

No analysis of confusion is needed in this Circuit and in these circumstances because in the licensing framework, where the alleged unauthorized user of the trademark continues to use the identical, previously licensed trademark after revocation of the license, likelihood of confusion is established. Church of Scientology, 794 F.2d at 44-45; The Southland Corp., 41 F. Supp. 2d at 243 ("use of the mark after termination of the licensing agreement, by definition, constitutes trademark infringement.") (internal citation omitted).

### D. The Balance of Hardships Favors Perry

The balance of hardships test "appears to be a purely equitable consideration of who will be hurt more by the decision." CBS Broadcasting Inc. v. ABC, Inc., No. 02-Civ.-8813, 2003 U.S. Dist. LEXIS 20258, at *44 (S.D.N.Y. Jan. 14, 2003). The equities clearly weigh in favor of injunctive relief.

Perry has expended enormous resources and effort over the course of thirty years to create the good will associated with the Marks both in the United States and around the world.

Varquin cannot be heard to complain that an injunction against its use of the Marks would impose more hardship upon it than denial of the injunction would impose upon Perry. Varquin's unauthorized use of the Mark, especially via publication of an illicit North American Edition, would make it extremely difficult if not impossible for Perry to find a new licensee to publish an authorized North American Edition. Gregory Dec., ¶ 23.

Furthermore, many of the advertisers in the North American Edition also purchase advertising space in the U.K. Edition and other editions of the Magazine. Thus Perry's inability to control Varquin's unauthorized and entirely independent North American Edition would compromise Perry's ability to attract international advertisers. Id., ¶ 24.

Varquin has been on notice of termination of the License since at least May 3, 2007, and it has been aware of its own nonpayment since March 31, 2007, as described above.

12

The requested injunction would still allow Varquin, whose principals have experience in the magazine industry, to publish a magazine about business travel so long as it did not use the Marks. Id., ¶ 25.

By contrast, any hardship Varquin may now suffer from an injunction has been brought on by its own infringing activities. Varquin acted at its peril. It remains free to publish its own materials. Perry simply seeks to protect its Marks from illegal appropriation. The injunctive relief thus is aimed only at Perry's infringing magazine, its infringing use of an unauthorized domain to conduct unauthorized Business Traveler business, and its infringing use of the Marks on the internet. If in response to this application, Varquin asserts that it will cease such violations, Varquin's losses as a result of this Court's Order should be minimal. Unlike the damage to Perry's reputation and trademarks, Varquin's damage may be precisely determined and compensated by money damages. Accordingly, the balance of hardships tips sharply in favor of awarding Perry the requested relief.

## III.   CONCLUSION

For the foregoing reasons, Perry respectfully requests that the Court grant Perry's request for a preliminary injunction ordering that Varquin and its officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them be enjoined and restrained from:

   a)   imitating, copying, or making any other infringing use of the Marks or hereafter creating a North American edition of the Magazine utilizing a confusingly similar title;

   b)   imitating, copying, or making any other infringing use or infringing publication or distribution of magazines using the Marks;

c)   manufacturing, assembling, producing, distributing, broadcasting, offering for distribution or broadcast, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any book, television program, website, magazine or related merchandise or service bearing any of the Marks or any mark that is confusingly similar thereto;

d)   using any simulation, reproduction, counterfeit, copy, or colorable imitation of the Marks in connection with the manufacture, assembly, production, distribution, broadcast, offering for distribution or broadcast, circulation, sale, offering for sale, import, advertisement, promotion, or display of any book, television program, website, magazine or related merchandise or service not authorized or licensed by Perry;

e)   using any designation of origin or description which can or is likely to lead anyone to believe that any book, television program, website, magazine or related merchandise or service has been produced, manufactured, assembled, distributed, broadcast, offered for distribution or broadcast, circulation, sold, offered for sale, imported, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by Perry, when such is not true in fact;

f)   using reproductions, counterfeits, copies or colorable imitations of the Marks or the Magazine or the articles presented in authorized editions of the Magazine in the distribution, broadcast, offering for distribution or broadcast, circulating, sale, offering for sale, advertising, importing, promoting, or displaying of any goods or services of Varquin;

g)   engaging in any other activity constituting an infringement of any of Perry's trademarks; and

h)   assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (g) above.

Dated: New York, New York
June 1, 2007

                         COWAN, DeBAETS, ABRAHAMS
                                  & SHEPPARD LLP

By: _____
Toby M.J. Butterfield (TB-8599)
Nancy E. Wolff (NW-7805)
Mason A. Weisz (MW-5954)
41 Madison Avenue, 34th Floor
New York, New York 10010
(212) 974-7474

*Attorneys for defendant-counterclaimant Perry Publications Limited*

15