UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VARQUIN ENTERPRISES INC., a New York corporation,

    Plaintiff,

v.

PERRY PUBLICATIONS LIMITED, a United Kingdom corporation,

    Defendant.

Docket No. 07-cv-3953 (LBS)

**SECOND DECLARATION OF JULIAN GREGORY**

**ECF Case**

---

I, JULIAN GREGORY, declare:

1. I am the Managing Director of defendant Perry Publications Limited ("Perry"). The matters stated below are true of my personal knowledge and if called upon to testify I could and would competently testify thereto, except where otherwise indicated.

2. I submit this declaration in opposition to the application by way of Order to Show cause for injunctive relief against Perry brought by plaintiff Varquin Publishing, Inc. ("Varquin"), a plaintiff in an action removed from State Court; and in further support of Perry's application by way of Order to Show Cause for a temporary restraining order and preliminary injunction prohibiting Varquin from utilizing Perry's registered trademarks "BUSINESS TRAVELER" and "BUSINESS TRAVELLER" (the "Marks") on and in connection with Varquin's magazine publishing ventures.

**Varquin Again Fails To Make Timely Payment to Perry.**

3. Counsel for Perry has advised me that on March 31, 2007, the Court directed Varquin to tender to Perry the overdue the funds which are due under

the license agreement between Varquin and Perry dated April 7, 2006 (the "License"). The License is Exhibit A to my declaration dated May 31, 2007.

4.  Attached hereto as Exhibit A is a true and correct copy of the wire transfer report for a payment of $28,619 on June 4, 2007 from Varquin to Perry. This payment was ostensibly meant to cover the $8,619 due to Perry on March 31, 2007, the $10,000 due April 1, 2007, and the $10,000 due May 1, 2007. Perry has received no other payment from Varquin.

5.  This payment is insufficient in three respects:

    a) Varquin did not include the $10,000 due June 1, 2007, which remains in arrears;

    b) Varquin did not include interest due under Clause 6.4 of the License, which also remains in arrears; and

    c) Varquin only made this payment at the Court's direction and did so more than 28 days after its due date. This is true even under Varquin's faulty reading of the termination provision of the License: "Varquin is entitled under the Agreement to cure the alleged breach at any time through and including May 31, 2007". Declaration of Adam Rodriguez dated May 15, 2007 ("Rodriguez Dec."), ¶ 9.

6.  Perry never waived Varquin's payment obligations. Mr. Rodriguez's declaration dated May 15, 2007 misleadingly states, "Varquin has now come up with the money to cover the missed payment and has offered it to defendant, but defendant has rejected the offer." That is false. What Perry rejected was Varquin's improper "offer" to make the payment subject to renegotiation of the terminated License.

**Varquin Rejects Perry's Attempts to Reach Settlement.**

7. Perry is a small, privately owned company employing about 35 people in a number of locations around the world. Perry considers the nine editions of Business Traveler magazine worldwide to be a family. In 2006, we invited Varquin to be part of that family. Unfortunately, throughout its publication of the U.S.-based edition of Business Traveler magazine (the "North American Edition"), Varquin declined to comport itself as a family member.

8. Both the manner of Varquin's publication of the North American Edition, and Varquin's irresponsible representation of the Business Traveler brand to the industry, discussed further below, have damaged Perry's Marks. Nevertheless, starting on May 3, 2007, when I first wrote to Varquin to confirm the contract termination, I have made clear my willingness to negotiate a new license under new terms.

9. After the Court's initial hearing of this matter on May 31, 2007, I directed Perry's counsel to propose two different licensing arrangements to Varquin.

10. Although Varquin has repeatedly said that all options are on the table, it has rejected all of Perry's proposals as dealbreaking non-starters, because Varquin demands that Perry relinquish ownership of its U.S. trademarks to Varquin. As discussed below, Varquin has repeatedly engaged in activities that harm the Business Traveler brand, and has not proven itself capable of successfully managing a North American Edition. When I notified Varquin of its breach and termination, and invited negotiation, my U.S. counsel received litigation papers instead. In the circumstances I have concluded that it would be commercially harmful to Perry to give Varquin absolute control of the Marks in the U.S.

**Varquin Treated the License As Not Requiring Minimum Sales.**

11. Varquin blames its nonpayment on Perry's supposed failure to meet minimum advertising sales requirements under the License, but Varquin did not treat the License as requiring a minimum.

12. Although Varquin has focused attention on the fact that the License appoints Perry as a sales representative to sell advertising in the North American Edition of the Magazine, the License also appoints Varquin to act as Perry's sales representative in North America. It provides:

> "The Licensee agrees with the Licensor: ... that it **shall act** as the Licensor's sales representative for the Territory (except those areas already covered by Licensor's sales representatives)." License Clause 5.4 (emphasis added).

13. Indeed, the phrasing of Clause 5.4 has a mandatory sense, as it states that Varquin "shall act..." That sense is absent from the clause on which Varquin relies, which merely <u>permits</u> Perry to act as Varquin's sales representative outside North America. That clause provides that:

> "The Licensee **shall appoint** the Licensor as the Licensee's sales representative outside the Territory..." License Clause 4.8 (emphasis added).

14. Despite the clear statement that Varquin was to act as Perry's advertising sales representative for Perry's foreign editions of the Magazine, Varquin alone has sold precisely **zero** advertisements for those editions.

15. By alone selling no advertisements for Perry's editions, Varquin treated these clauses as not requiring a particular level of sales. Varquin cannot therefore credibly argue that Perry is somehow in breach of the contract for not selling enough advertising.

**Perry Made Substantial Sales of Advertisement in 2006 and 2007.**

16. In contrast to Varquin's failure to sell advertising for foreign editions during 2006 and 2007, Perry has continued to make substantial sales of advertising for the North American Edition.

17. In fact, our sales efforts have recently secured advertising for the North American Edition of $64,454.60, although details have not been passed to Varquin due to termination of the License. Of that $64,454, a portion—$14,025.00—will not be collected because it was for a Changi Airport ad in the June edition that was not published due to the uncertainty over whether a North American Edition would be released that month.

18. To date, Perry's sales of advertising for the North American Edition net of advertising agency commissions, including forward sales, are as follows (cancelled Changi Airport sale in italics):

|  | Sales by Perry for 2006 editions | Sales by Perry for 2007 editions |
|---|---|---|
| February |  |  |
| March |  |  |
| April |  | $9,956.00 |
| May | $32,737.00 |  |
| Jun | $27,635.00 | *($14,025.00)* |
| Jul/Aug | $17,135.00 | $20,236.80 |
| Sep | $16,711.80 | $14,025.00 |
| Oct | $10,500.00 |  |
| Nov | $9,600.00 |  |
| Dec | $23,346.80 | $6,211.80 |
|  |  |  |
| Total (including the cancelled $14,025.00) | $137,665.60 | $64,454.60 |

19. As alluded to in my declaration dated May 31, 2007, only four advertising clients who bought advertising in 2006 had not yet purchased advertising in the North American Edition for 2007.

20. As explained below, Varquin's own unreasonable advertising policies seriously jeopardized these advertising opportunities, but one has now purchased ads, and at least one other will likely purchase ads in 2007:

    a) <u>Jumeirah Hotel Group</u>. In 2007 they have yet to book a single page in any edition of the Magazine, but an ad campaign is expected to start in September.

    b) <u>Airport Express</u>. Varquin hampered our pitch by demanding a price increase of 38% and new stringent payment terms. The ad purchaser recently returned from maternity leave.

    c) <u>Panerai</u>. This luxury watch brand bought nearly $200,000 of advertising in various editions of the Magazine for the first time in 2006. It has not booked a single page in any of the editions for 2007.

    d) <u>Changi Airport</u>. This state-owned Singapore airport advertises in the Magazine on average only two or three times per year, and usually only in the second half of the year. Besides imposing an unreasonable 53.6% rate increase, Varquin demanded 3% interest on accounts more than 30 days overdue, a difficult concession to obtain from a government entity. Despite this, Perry has now secured commitment for ads at a higher price this year albeit without the stringent payment terms.

21. Varquin claims that Perry's focus shifted from Business Traveller to other publications. This is not true. Last summer Perry opened a new Business Traveller sales office in Singapore. In Asia our sales team has more than doubled, with growth of 150%, reflecting extra resources on Business Traveller and new sales staff for our new title.

22. In addition, when the Business Traveller sales teams sell, they pitch all editions. Our summary media kit used by all sales representatives, a true and correct copy of which is attached hereto as Exhibit B, highlights that the North American Edition was positioned in the same way as all editions.

**Varquin Impeded Perry's Efforts to Sell Advertising For Varquin.**

23. Although advertising sales are influenced by many factors and are difficult to predict, I believe that numerous unreasonable and irresponsible acts by Varquin impeded Perry's efforts to sell advertising for Varquin.

24. Varquin demanded price increases from existing clients of over 50%. Varquin has demanded stringent payment terms which cannot be satisfied by advertising agencies in Asia, where different payment practices apply.

25. Perry's advertising sales efforts outside of North America have compromised the Magazine's relationships. Perry acknowledges that since the License makes Perry a non-exclusive representative of Varquin for sales outside of North America, Varquin has the right to sell advertising outside North America. However, Varquin has exercised that right in an unreasonably self-destructive manner, compromising Perry's ability to sell advertisements for all editions, including the North American Edition.

26. This has been hugely damaging to the Business Traveller brand. Rather than following the price guidelines Varquin gave to Perry, Varquin has been selling ads for a fraction of the regular price, and has even unnecessarily given advertising away for free. Since it has done this without coordinating with Perry, Varquin has brought upon itself and upon the entire Business Traveler family a number of negative consequences.

27. If Perry's sales representatives are trying to sell pages at Varquin's imposed prices of, e.g., $14,000-$25,000, they have no chance if Varquin

itself has approached the same prospects quoting rates of just a few thousand dollars (or nothing). Besides causing morale problems within the Business Traveler sales family, Varquin's double standard causes advertisers to view Perry as dishonest for trying to sell at the higher rates Varquin imposes on Perry rather than rates the advertiser can receive if it deals directly with Varquin.

28.   Worse still, clients then expect similar discounts in all the other editions. These discounts are not sustainable and so the Business Traveller family as a whole either takes a loss or loses the business altogether. This inflicts many thousands of dollars of losses upon Perry and all Business Traveller licencees and partners, including—indirectly—Varquin itself.

29.   In a counterproductive attempt to hoard commissions, Varquin has failed to honor normal practice for sales outside of North America. Normal practice would be for Varquin to notify the sales teams at foreign editions of the Magazine of possible sales contacts outside North America for a foreign sales team to follow up, as such teams have a deeper knowledge of foreign markets for our brand than Varquin does. Instead, Varquin has tried to do it without assistance. Although Varquin has not disclosed to the Court the revenues it has booked from North American Edition ads that Varquin sold, we assume that Varquin's go-it-alone strategy failed.

30.   Furthermore, Varquin's owners have abused Business Traveler's relationships with its advertisers when traveling on their airlines or staying at their hotels. This use of Perry's brand as a means of enjoying free holidays and better hotel service severely damages Perry's brand and its business relationships. One example involves Eos Airlines ("Eos"), the most expensive and exclusive of the business-class only airlines across the Atlantic from New York to London. Eos was used by Varquin's Mr. Rodriguez to take a Valentine's weekend trip to London with

Jake Porter to stay at the five-star Jumeirah Lowndes Hotel. Nobody from the U.K. Edition in London knew they were coming or staying at the hotel, and Perry only found out when an employee of the hotel asked Perry to supply a copy of editorial coverage that Varquin had promised. Perry cannot do so, as Varquin never published any.

**Varquin Did Not Divert Advertisers Away From the North American Edition.**

31. In his affidavit, Varquin's principal Adam Rodriguez claims that I told him I advised Eos to spend money in Perry's new publication Buying Business Travel (BBT), rather than in the North American Edition of Business Traveler. That is false. Moreover, Eos has advertised in BBT since before Perry published it. Varquin—not Perry—handled the U.S. sales pitch to Eos, and Varquin failed.

**Conclusion.**

32. For the above reasons and for the reasons described in the accompanying Memorandum of Law and Declaration of Toby M.J. Butterfield, as well as in my declaration dated May 31, 2007, the Court should grant an injunction restraining Varquin's further use of the Marks and should deny Varquin's application for an injunction.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct and that this Declaration was executed on June 6, 2007 at Mumbai, India.

_____
JULIAN GREGORY